Opinion for the court filed by Circuit Judge BRYSON. Concurring opinion filed by Circuit Judge PLAGER.
BRYSON, Circuit Judge.
The contract at issue in this government contract case contains an option clause. When the government sought to exercise that option, the contractor objected that the attempt was legally ineffective. After the contracting officer rejected the contractor’s position and directed it to perform the option, the contractor filed an action in the Court of Federal Claims seeking a declaration that it was not obligated to perform because the government had not validly invoked the option clause. The Court of Federal Claims held that the contractor was required to perform, but at a delivery rate lower than that ordered by the contracting officer. When the contractor refused to perform even at the rate directed by the court, the government terminated the contract for default.
We reject the government’s threshold argument that the Court of Federal Claims lacked jurisdiction over the contractor’s request for declaratory relief. On the merits, we hold that, although the option clause was not effectively exercised, the disputes clause of the contract required the contractor to perform in accordance with the decision of the Court of Federal Claims pending resolution of the action. Because the performance period required by the trial court’s decision has expired, our holding that the contractor has no obligations under the option clause does not affect the contractor’s obligations under the disputes clause. We therefore reverse the order of the Court of Federal Claims upholding the validity of the option exercise, but we affirm the court’s order that Alliant was contractually obligated to perform the option quantity at a rate of 1550 bombs per month, although we do so based on the disputes clause rather than the option clause.
I
In October 1995, Global Environmental Solutions, Inc., a division of Alliant Tech-systems, Inc., (Alliant) entered into a contract with the United States Army to demilitarize 24,497 bombs. The contract included an “Evaluated Option for Increased Quantity,” which allowed the Army to increase the number of bombs to be demilitarized by up to 100 percent of the base number in the contract. The option provision specified the time period during which the option could be exercised, the time at which option performance was to begin, and the monthly rate at which the option quantity was to be delivered. The contract also incorporated by reference the standard “disputes clause,” which is set forth at 48 C.F.R. § 52.233-1 and provides as follows:
*1264 Disputes
(a) This contract is subject to the Contract Disputes Act of 1978 as amended (41 U.S.C. 601-613).
. . . . .
(i) The contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.
During the summer of 1997, the contracting officer advised Alliant that he planned to exercise the evaluated option in full by increasing the number of bombs to be demilitarized by 100 percent. Alliant objected, arguing that the time for exercising the option had expired. Nonetheless, on August 4, 1997, the contracting officer issued a unilateral modification of the contract purporting to exercise the option.
In a letter to the contracting officer dated September 11, 1997, Alliant argued that the contracting officer’s attempt to exercise the option was ineffective. Alli-ant took the position'that it was not bound to perform because (1) the attempted exercise of the option was untimely and (2) the contracting officer had specified a delivery rate that was not set forth in the option clause. On September 17, 1997, the contracting officer rejected Alliant’s arguments by letter and insisted that Alli-ant demilitarize the additional bombs at the specified rate. The contracting officer disagreed with Alliant’s interpretation of the delivery rate and the time period for exercising the option. Pursuant to the contracting officer’s schedule, the first delivery of demilitarized bombs under the option clause was due on October 31, 1997.
On the day of the contracting officer’s letter, Alliant filed a complaint in the Court of Federal Claims seeking a declaration that it was not required to perform the option. Alliant also sought an injunction barring the government from enforcing the option clause or from terminating the contract for default for failure to perform the option. The trial court ruled that it did not have jurisdiction to enter an injunction, but that it had jurisdiction to issue a declaratory judgment. On October 31, 1997, the court addressed the merits of Alliant’s request for declaratory relief.
In its order, the Court of Federal Claims declared that Alliant was required to perform the option, but at a rate lower than that ordered by the contracting officer. Alliant has appealed from the aspect of the court’s order holding that the option was effectively exercised. The government has appealed from the court’s ruling that it had jurisdiction to grant declaratory relief and that the delivery rate specified by the contracting officer was too high.
II
The Tucker Act defines, the jurisdiction of the Court of Federal Claims with respect to disputes arising under the Contract Disputes Act (CDA) as follows:
The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.
28 U.S.C. § 1491(a)(2). The parties agree that the CDA grants jurisdiction to the Court of Federal Claims and the agency boards over a contractor’s request for relief only when the appeal or action is based on a qualifying claim filed by the contractor and a final decision by the contracting officer. See generally Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed.Cir.1995) (in banc). In the portion of its brief directed to jurisdiction, the government argues that the Court of Federal Claims lacked jurisdiction over the complaint in this case because the complaint was not preceded *1265 by either a qualifying claim by Alliant or a final decision by the contracting officer. Alliant responds that the correspondence between the parties is properly characterized as constituting a claim and a final decision.
A
AUiant’s September 11, 1997, letter to the contracting officer set out Alliant’s position that the attempt to exercise the option was ineffective, and it advised the contracting officer that “if you disagree with our position, please consider this letter a claim and request for a final decision under the CDA.” The Federal Acquisition Regulation defines a “claim” as
a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract....
48 C.F.R. § 33.201.
The government does not dispute that the September 11 letter was a written demand seeking adjustment or interpretation of a contract term, ie., the evaluated option provision. Instead, the government argues that the demand did not constitute a “claim” because Alliant was not seeking relief “as a matter of right.” The “as a matter of right” requirement of the definition of “claim” was not satisfied, according to the government, because the disputes clause in the contract required Alliant “to comply with the contracting officer’s directive first and litigate about the directive’s propriety later.” We reject that argument for several reasons.
First, the phrase “as a matter of right” in the regulatory definition of a “claim” requires only that the contractor specifically assert entitlement to the relief sought. That is, the claim must be a demand for something due or believed to be due rather than, for example, a cost proposal for work the government later decides it would like performed. See Reflectione, 60 F.3d at 1576; Essex Electro Eng’rs, Inc. v. United States, 960 F.2d 1576,1580-81 (Fed.Cir.1992). Alliant’s letter asserted specific contractual and legal grounds for its interpretation of the option and by doing so met that requirement.
Second, the government’s interpretation of the “as of right” language would require the court to determine an important question going to the merits of the case - whether the option clause obligations were subject to the ongoing performance obligation of the disputes clause - before deciding the issue of jurisdiction. That approach reverses the proper sequence of determining jurisdiction before reaching the merits; in fact, it boils down to finding that the court has jurisdiction only after determining that the claimant should win.
Third, the government’s argument that the disputes clause barred Alliant from filing a claim seeking an interpretation of the option clause until after it had completed performance of the option does not find support either in the language of the contract’s disputes clause or in the statute that generally authorizes the use of disputes clauses in government contracts.
Section 6(b) of the CDA, 41 U.S.C. § 605(b), provides that nothing in the Act “shall prohibit executive agencies from including a clause in government contracts requiring that pending final decision of an appeal, action, or final settlement, a contractor shall proceed diligently with performance of the contract in accordance with the contracting officer’s decision.” The standard disputes clause, which was incorporated by reference in the Alliant contract, largely tracks the statutory language and provides that “pending final resolution of any request for relief, claim, appeal, or action arising under the contract,” the contractor must “proceed diligently with the performance of this contract” and “comply with any decision of the contracting officer.” 48 C.F.R. § 52.233-1. By referring to the requirement that performance be continued “pending” a final *1266 resolution of the contractor’s rights, the statute and the disputes clause contemplate that, while performance is ongoing, the contractor may seek a final resolution of its rights by an appeal to an agency board of contract appeals or an action in the Court of Federal Claims.
The legislative history of the CDA is not at odds with this interpretation. The Senate Report on the Act makes clear that one reason for giving contractors “unique” appeal rights from adverse decisions by contracting officers is that contractors are obligated under the disputes clause to continue work “without stopping to litigate.” S.Rep. No. 95-1118, at 32, reprinted in 1978 U.S.C.C.A.N. 5235, 5266. The Senate Report makes clear that the disputes clause prohibits a contractor from stopping work pending litigation, and it further indicates that in the normal course contractors will be expected to perform as directed and to seek an equitable adjustment to recover the cost of the additional work if that work was not required by the contract. See id. (“Government contractors must perform and then argue about the amount of the equitable adjustment at some later time.”). But it reads too much into the Senate Report to conclude that the disputes clause deprives the Court of Federal Claims of the authority to address a claim that would otherwise be within the court’s jurisdiction simply because the contractor has not completed the performance that is the subject of the contractor’s claim.
The government’s citation of Dynamics Corp. of America v. United States, 182 Ct.Cl. 62, 389 F.2d 424 (1968), is unavailing for the same reason. In that case the Court of Claims held that a contractor could recover the additional costs it incurred in performing an option that the contractor contended was invalidly exercised. In the course of the opinion, the court noted that the disputes clause obligated the contractor to continue performing the contract, as directed by the contracting officer. While the Dynamics Corp. case is relevant to whether the disputes clause required Alliant to perform under the contract pending a decision as to the scope of its contractual obligations, that decision does not shed light on the separate question whether the court has jurisdiction to address Alliant’s claim that the contract does not require it to perform. To hold that Alliant has a contractual obligation to perform in accordance with the contracting officer’s decision until it receives a different ruling on the scope of the contract does not mean that it must postpone seeking such a ruling from the Court of Federal Claims until it has performed in full and seeks compensation for the additional work that the contract did not require.
Contrary to the government’s apparent assumption, the court’s exercise of jurisdiction in cases of this sort will not mean that parties such as Alliant will be free to ignore their disputes clause obligations. Holding that the court may address Alli-ant’s challenge to the contracting officer’s order to perform the option does not free Alliant from its obligation under the disputes clause to perform the option as directed pending a favorable decision from the court. That obligation continues. The point is simply that the disputes clause does not impose an additional obligation on the contractor to wait until performance is completed before filing a claim for relief from the contracting officer’s decision. As Alliant puts the matter in its brief, the disputes clause creates a contractual requirement, not a jurisdictional prerequisite.
Finally, to hold that the disputes clause required Alliant to perform the option and limited Alliant’s relief to post-performance compensation for work that it contends it was not required to perform would be contrary to the language of the regulatory definition of “claim.” That definition does not limit claims to requests for monetary relief, but includes, in addition to requests for “the payment of money in a sum certain,” requests for “adjustment or inter *1267 pretation of contract terms, or other relief arising from or relating to the contract.” To hold that the disputes clause bars any pre-performance claim seeking an interpretation of contract terms would render largely meaningless those portions of the definition of claim that refer to requests for nonmonetary relief. Accordingly, we reject the government’s contention that, because of the disputes clause, Alliant’s pre-performance request for an interpretation of the contract did not constitute a demand or assertion “as a matter of right” and therefore did not constitute a valid claim within the meaning of the regulatory definition of that term.
B
As noted, the Tucker Act gives the Court of Federal Claims jurisdiction over CDA claims only when “a decision of the contracting officer has been issued under section 6 of [the CDA].” 28 U.S.C. § 1491(a)(2). Section 6 provides that claims by the contractor or the government shall be submitted to the contracting officer for a decision, and that the contracting officer’s decision shall be in writing, shall be forwarded to the contractor, shall state the reasons for the decision, and shall inform the contractor of its rights with respect to the decision. See 41 U.S.C. § 605(a).
Alliant contends that the contracting officer’s letter dated September 17, 1997, was a final decision of the contracting officer for purposes of establishing jurisdiction. The government responds that the letter cannot be regarded as a final decision of the contracting officer because the contracting officer made it clear that he did not intend for the letter to constitute a final decision.
The contracting officer’s decision was certainly final with respect to the contracting officer’s disposition of Alliant’s claim regarding the purported invalidity of the option exercise. The contracting officer stated in the letter that Alliant’s contract interpretation was incorrect, that the option was validly exercised, and that Alliant was expected to perform under the option as directed. The portion of the letter that the government points to as indicating that the letter was not meant to be a final decision is the last paragraph, which reads as follows:
If you choose to submit a claim under our contract, I suggest you do so in conformance with the Contract Disputes Act provision, that is, you must certify your claim and I will render a formal Contracting Officer’s Final Decision within 60 days.
That sentence indicates that, because the contracting officer thought that a final decision may be rendered only in response to a proper claim, he did not consider his letter to be a final decision. Alliant failed to make a proper claim, the contracting officer believed, because Alliant’s claim was not certified.
The CDA requires certification for claims that exceed $100,000. See 41 U.S.C. § 605(c)(1) (1994). The government argued before the Court of Federal Claims that Alliant’s claim required certification. The court decided otherwise, and the government has not challenged that aspect of the court’s decision. For purposes of this case, we therefore take as correct the trial court’s ruling that certification was not necessary and that the contracting officer’s conclusion on the issue of finality, which was based on the absence of certification, was accordingly in error.
Moreover, the absence of a statement in the contracting officer’s letter acknowledging that the letter constituted a final decision from which Alliant was entitled to appeal is not fatal to Alliant’s action. A letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision. See Placeway Constr. Corp. v. United States, 920 F.2d 903, 907 (Fed. Cir.1990). By unequivocally rejecting Alliant’s arguments regarding the option exercise and requiring Alliant to perform with *1268 the option period beginning only two weeks from the date of the letter, the contracting officer indicated that his decision was effective and not subject to further discussion. The government cannot, in response to a proper claim, demand that a contractor obey the contracting officer’s directive without further discussion while characterizing that directive as nonfinal. We conclude that the claim and final decision prerequisites of CDA jurisdiction were met in this case.
III
The government next contends that even when there is a claim and a final decision, the Tucker Act does not give the Court of Federal Claims jurisdiction over a nonmonetary claim of the sort at issue in this case. The government characterizes the limitations on the court’s jurisdiction to grant nonmonetary relief in two ways. First, it argues that disputes arising “prior to the completion of work on a contract” are within the bounds of “contract administration” and thereby outside the jurisdiction of the Court of Federal Claims to grant relief. Second, the government argues that the nonmonetary disputes referred to in the Tucker Act are limited to those disputes “that otherwise would be entirely excluded from the court’s jurisdiction.” Jurisdiction is lacking, the government explains, over disputes that have not “ripened into a monetary dispute, but ... could by the contractor’s efforts alone.” Thus, under the government’s theory, a nonmonetary dispute is outside the court’s jurisdiction if the contractor has not completed work on the contract and if the contractor, by doing particular designated work, could convert the claim into one for monetary relief.
The government’s definition of nonmon-etary disputes is not supported by the language of the statute, by its legislative history, or by this court’s precedents. In defining the jurisdiction of the Court of Federal Claims over CDA disputes, Congress has chosen expansive,- not restrictive, language. As amended in 1992, the Tucker Act gives the Court of Federal Claims jurisdiction “to render judgment upon any claim by or against ... a contractor under section 10(a)(1) of the Contract Disputes Act, including [certain specific kinds of non-monetary disputes], and other non-monetary disputes on which a decision of the contracting officer has been issued under section 6 of the [CDA].” 28 U.S.C. § 1491(a)(2). Significantly, that portion of the statute begins by broadly granting the court jurisdiction over “any claims”; it starts the list of specific kinds of nonmone-tary disputes with a nonrestrictive term (“including”); and it ends the list with equally nonrestrictive language (“and other nonmonetary disputes”). The government’s argument for a restrictive definition of the term nonmonetary disputes is at odds with the open-ended language used in the statute.
Seeking support for its jurisdictional argument in legislative history, the government cites a statement made by Senator Heflin during the Senate’s consideration of the 1992 amendments to the Tucker Act. The amendment was passed in the wake of this court’s decision in Overall Roofing & Construction, Inc. v. United States, 929 F.2d 687 (Fed.Cir.1991), in which the court held that the Court of Federal Claims lacked jurisdiction to review a termination for default not involving a monetary claim. While the statement of a single senator does not trump plain statutory language, the government has, in any event, read too much into Senator Heflin’s comments. Senator Heflin noted that the 1992 amendment was designed to “restore the option of appealing any final decisions to either the Court of Federal Claims or agency board of contract appeals [as] was intended in the Contract Disputes Act.” 138 Cong. Rec. 34,204 (1992). He cautioned, however, that the amendment was not intended to permit contractors to avoid the “dispute” and “final decision” requirements of the Act, and that it would “not permit contractors to seek injunctions or *1269 declaratory judgments that would interfere with the contracting officer’s right to direct the manner of performance under the changes clause.” Id.
Senator Heflin’s statement has been construed to mean that the 1992 amendment did not “relinquish the Government’s contractual right to have the contractor perform pending resolution of disputes.” Valley View Enters., Inc. v. United States, 35 Fed. Cl. 378, 385 (1996). That much is plainly true, as nothing in the 1992 amendment had the effect of relieving contractors of their performance obligations under the changes clause or, for that matter, the disputes clause. But the government takes Senator Heflin’s remark one step further and argues that it means that a contractor who is asked to do work that the contractor believes is not required by the contract must do the work and file a claim for compensation when the work is completed. That is reading too much into Senator Heflin’s comment. Nothing in his comment suggests that a contractor may not seek review of a final decision of a contractor on a claim regarding an ongoing performance issue; his remarks simply mean that the contractor may not use the appeal as an excuse to avoid its obligations under the changes clause (or the disputes clause) of continuing performance pending the resolution of the dispute by the Court of Federal Claims or an agency board of contract appeals.
Support for this construction of the 1992 amendment to the Tucker Act can be found elsewhere in the legislative history. Chief Judge Smith of the Court of Federal Claims, testifying in favor of an earlier version of the bill that amended the Tucker Act, responded to a question about whether giving the court the power to grant declaratory relief would “cause parties to come to court prematurely in an effort to get the court to intercede.” Court of Federal Claims Technical and Procedural Improvements Act: Hearing on S. 2521 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 102d Cong. 40 (1992). He answered that contractors could already obtain such relief from the boards of contract appeals, and that it was consistent with the purposes of the CDA to grant parties a choice of forum for all claims that were subject to review. In addition, he noted that allowing the court to grant declaratory relief would not “interfere with the operation of ongoing contracts,” because the disputes clause in government contracts “says the contractor has to go on performing while any dispute is occurring.” Id. The Department of Justice opposed the proposal to authorize the court to grant declaratory relief on the ground that it would result in “piecemeal attacks on the day-to-day administration of government procurement law [that] could wreak havoc with the Government’s procurement process.” Id. at 18-19 (statement of Assistant Attorney General Stuart A. Schiffer). In light of Chief Judge Smith’s explanation of the role of the disputes clause and Congress’s apparent rejection of the concerns expressed by the Department of Justice, Senator Heflin’s remarks cannot be construed to suggest that if the disputes clause applies, the contractor is barred from seeking review of a claim until the work in question is completed.
The government’s restrictive definition of the statutory reference to “nonmonetary disputes” also does not square with this court’s decision in Garrett v. General Electric Co., 987 F.2d 747 (Fed.Cir.1993). In that case, this court noted that in the 1992 amendments to the Tucker Act, Congress intended to ensure “jurisdictional parity” between the boards of contract appeals and the Court of Federal Claims. The court then held that the jurisdiction of the boards of contract appeals over nonmonetary disputes is not limited to terminations for default but includes what the court characterized as a “nonmonetary substitute for monetary relief.” Id. at 750-51. The court’s ruling on that issue was consistent with the decisions of most of the *1270 boards of contract appeals, which have held that they have authority under the CDA, as they did under pre-CDA law, to grant declaratory relief when appropriate. See, e.g., Varo, Inc., 87-1 B.C.A. ¶ 19,430, at 98,232 (DOTBCA 1986); Smith’s, Inc., 85-2 B.C.A. (CCH) ¶ 18,132, at 91,016 (VABCA 1985); McDonnell Douglas Corp., 83-1 B.C.A. (CCH) ¶ 16,377, at 81,-422 (ASBCA 1983), aff'd in part and rev’d in part on other grounds, 754 F.2d 365 (Fed.Cir.1985); Robert J. DiDomenico, 80-1 B.C.A. (CCH) ¶ 14,412, at 71,040 (GSBCA 1980); see generally Philomath Timber Co., 89-1 B.C.A. (CCH) ¶ 21,418, at 107,945-47 (IBCA 1988) (citing cases).
In the Garrett case, the contracting officer directed General Electric to correct or replace certain allegedly defective engines after the engines had been accepted and certain latent defects had appeared. The Board of Contract Appeals treated the contracting officer’s directive as a “claim” over which the Board of Contract Appeals had jurisdiction, and this court agreed. The court’s analysis in Garrett is inconsistent with the government’s theory of this case, since General Electric could have performed as directed and sought monetary compensation for its work afterwards. Instead, the court held that the nonmone-tary claim provided a viable basis for board jurisdiction. Since the court further held that board jurisdiction is in “parity” with the jurisdiction of the Court of Federal Claims, the Garrett case stands for the proposition that nonmonetary claims are not outside the jurisdiction of the Court of Federal Claims simply because the contractor could convert the claims to monetary claims by doing the requested work and seeking compensation afterwards.
IV
The government argues at some length that “prudential considerations” counsel against holding that the Court of Federal Claims had jurisdiction to entertain Alliant’s request for declaratory relief. The government’s argument, however, confuses the question whether the Court of Federal Claims had jurisdiction to entertain Alliant’s complaint with the question whether the court should grant relief on the merits and what form such relief should take. See Spruill v. Merit Sys. Protection Bd., 978 F.2d 679, 686 (Fed.Cir. 1992). We have held above that the Tucker Act grants the Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms. The jurisdiction of that court is defined by Congress, and the “prudential considerations” that the government presses upon us cannot alter the jurisdictional lines that Congress has drawn.
To the extent that the government’s “prudential considerations” argument is intended to suggest that we should fashion a broad, non-jurisdietional bar to judicial consideration of nonmonetary claims raised prior to contract performance, we find no authority in the statute or our precedents to support such a course. The government argues that to permit Alliant to obtain judicial review of its contract interpretation claim in this case would open the door to piecemeal review of routine matters of contract administration. While the possibility of a multiplicity of actions and appeals for review of contract interpretation issues during the course of contract performance is a legitimate concern, see Garrett v. General Elec. Co., 987 F.2d at 751, we believe that the requirement of the disputes clause that performance continue pending the final disposition of the litigation will have the effect of discouraging most requests for review during the pendency of the contract. In any event, as indicated, Congress has granted relatively free access to the boards of contract appeals and the Court of Federal Claims by authorizing review of final decisions of contracting officers on “any claim” by a contractor, 28 U.S.C. § 1491, and “any appeal [from a contracting officer’s decision on a claim] relative to a contract *1271 made by [an] agency,” 41 U.S.C. § 607(d). The FAR has likewise ensured that review of contract claims will be relatively easy to obtain, by defining the term “claim” broadly, to include a demand or assertion seeking, as a matter of right, inter alia, “the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.” 48 C.F.R. § 33.201. We are therefore persuaded that neither Congress nor the drafters of the FAR intended to create a comprehensive “prudential” basis for dismissing all but a narrow class of actions on nonmone-tary claims brought in the Court of Federal Claims. If Congress or the FAR drafters decide that actions and appeals are too freely available for claims arising during the performance of government contracts, they may make adjustments, by either statutory or regulatory change.
This is not to say that the Court of Federal Claims (or an agency board of contract appeals) is required to issue a declaration of rights whenever a contractor raises a question of contract interpretation during the course of contract performance. In responding to such a request, the court or board is free to consider the appropriateness of declaratory relief, including whether the claim involves a five dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties’ interests.
While a contractor may want to know ahead of time how a contract issue will be resolved — such as whether the contractor’ will be entitled to additional compensation under the changes clause for a particular item of work directed by the contracting officer — such cases do not ordinarily put into question whether the contractor is obligated to perform at all. In such a case, the dispute typically concerns whether the government will be obligated to grant an equitable adjustment after the ordered performance is completed. It would normally be appropriate in such cases for the court or board to decline to issue a declaratory judgment and to await a later equitable adjustment claim by the contractor. In refusing a request for declaratory relief in the absence of a need for an early declaration of the parties’ rights, the court or board would be applying a principle analogous to the traditional rule that courts will not grant equitable relief when money damages are adequate.
The discretion to grant declaratory relief only in limited circumstances allows the court or board to restrict the occasions for intervention during contract performance to those involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue. The Court of Federal Claims regarded this case as a particularly suitable candidate for declaratory relief. Alliant’s argument throughout has been that, once it had performed the main contract, it had no contractual obligations to the government under either the option clause or the disputes clause. Thus, Alliant objected to the requirement that it perform at all, not to the requirement that it perform without additional compensation. The Court of Federal Claims concluded that Alliant’s arguments were nonfrivolous and that there was a special need to resolve the issue in a timely manner, since requiring Alliant to perform under the option clause without a ruling on its claim that it had no obligations under that clause would have denied Alliant any meaningful relief.
The Court of Federal Claims carefully considered the parties’ arguments regarding the appropriateness of judicial intervention, and we are convinced that the court did not abuse its discretion by entertaining Alliant’s request for declaratory relief. If the court had accepted Alliant’s argument on the merits, it would have held that Alliant had no obligation to perform under the option clause. That ruling, unless stayed, would also have preempted any disputes clause performance obligations. Thus, under Alliant’s theory, this case is one in which the government’s con *1272 tract rights were terminated but in which the government attempted, following termination, to impose additional duties on the contractor. Viewed in that manner, the posture of this case is similar to that of Garrett v. General Electric Co., 987 F.2d 747 (Fed.Cir.1993). In that case, the Armed Services Board of Contract Appeals held that it was proper for it to entertain the contractor’s contention that it was not required to do additional work under an already completed contract, and this court sustained the board on that point. We therefore reject the government’s argument that the Court of Federal Claims should have dismissed Alliant’s complaint for lack of jurisdiction or denied its request for declaratory relief for prudential reasons.
V
Because we conclude that the Court of Federal Claims was correct in determining that it had jurisdiction to entertain Alli-ant’s request for relief and that it was not required to deny relief for prudential reasons, we turn to the merits. By its complaint Alliant sought a declaration that the government failed properly to exercise the option and that Alliant therefore had no contractual obligations to demilitarize bombs beyond those of the original contract. The government contends that Alli-ant had such obligations under both the option clause and the disputes clause of the contract.
A
The government argues that the Court of Federal Claims was correct in holding that the option clause was validly exercised and that Alliant was therefore required to perform its obligations under that clause. The government disagrees with the court, however, with respect to the rate of delivery that the option clause required. In the government’s view, the option clause required Alliant to perform at the rate set by the contracting officer rather than at the lower rate set forth in the court’s order.
Alliant responds that the option was improperly exercised and for that reason it had no obligations whatsoever under that clause. Alliant points to two asserted flaws in the manner in which the government sought to exercise the option. First, Alliant argues that the invocation of the option was untimely. Second, Alliant argues that the rate of delivery ordered by the contracting officer was greater than the rate called for under the option clause. We agree with the government as to the first argument, but we agree with Alliant as to the second.
1
Under the terms of the contract, the option clause had to be exercised prior to “acceptance of 85% of the total contract quantity.” The original contract schedule provided that 85% of the bombs would be delivered by March 30, 1997. Early in the contract period, the parties agreed upon a modification of the delivery schedule under which 85% of the bombs would not have to be delivered until August 31,1997. Alliant proposes that the reference to “acceptance of 85% of the total contract quantity” should be construed to mean the date by which the parties originally expected that percentage would be accepted, i.e., by some time shortly after March 30, 1997.
We reject that argument. If the parties had intended to restrict the option exercise to a period of time ending with a date determinable at the time they signed the contract, they could have put that date in the clause. By using “acceptance” they must have meant that the actual fact of acceptance would determine when the exercise period ended. Both parties agree that the actual acceptance of 85% of the contract quantity occurred after the government gave Alliant written notice under the option clause.
The language of the delivery schedule modification does not advance Alliant’s ar *1273 gument. That modification did not mention the option clause, and it stated that “all other terms and conditions [of the contract] remain unchanged.” For that reason, Alliant argues, the duration of the exercise period should not be changed by the new delivery schedule. Contrary to Alliant’s suggestion, however, the new delivery schedule did not alter the portion of the contract setting the time for exercising the option. Regardless of the modification, the option exercise period was to end at the time of the actual acceptance of 85% of the total quantity under the contract, whenever that occurred. Accordingly, the trial court was correct to conclude that the government exercised the option within the specified period.
2
The second basis on which Alliant argues that the government failed properly to exercise the option is that the contracting officer insisted on a rate of performance greater than that required by the option clause. The relevant portion of the option clause reads:
e. Delivery of the items added by exercise of this option shall continue immediately after, and at the same rate as delivery of like items called for under the contract, unless the parties agree otherwise.
The government contends that the contracting officer chose the correct delivery rate for the option period. As an initial matter, however, the government argues that Alliant is estopped from pressing its argument that the incorrect delivery rate rendered the option exercise invalid.
The government asserts that Alliant knew about the different delivery rate pri- or to the end of the option exercise period, but did not inform the government of its objection until after that period had run. Because Alliant did not object to the delivery rate during the time that the contracting officer could have modified the terms of the option exercise, the government argues that Alliant is estopped from raising that argument now.
In E. Walters & Co. v. United States, 217 Ct.Cl. 254, 576 F.2d 362 (1978), on which the government relies in making its estoppel argument, the contractor sought increased compensation for performing under an option on the basis that the option had been exercised in violation of procurement regulations. The court held that the contractor was estopped from arguing that the option was invalid because it had been aware of the regulatory inadequacy and had performed without any indication to the government that it objected to the exercise.
Alliant’s actions were quite different from those of the contractor in Walters. Instead of quietly performing and then later disputing the option exercise, Alliant vociferously denied that the option had been validly exercised and refused to perform. Although Alliant’s failure to raise the “rate of delivery” issue until after the expiration of the option exercise period might have barred it from objecting if the contracting officer had reduced the rate of delivery to the rate requested by Alliant in its September 11, 1997, letter, the contracting officer did not do so. Nor did the contracting officer adhere to the higher rate on the ground that Alliant had not argued in favor of a lower rate until after the period for exercising the option had expired. Instead, the contracting officer took the position that the higher delivery rate that he had insisted on was a correct interpretation of the contract. Under these circumstances, we see no basis for estopping Alliant from arguing that the contracting officer’s rate was incorrect and that the contracting officer’s insistence on that delivery rate rendered the option exercise invalid.
On the merits of the contract interpretation issue, both parties agree that the exercise of the option properly called for a 100% increase in the number of bombs to be demilitarized; they disagree *1274 only about the delivery rate required by the option clause. Affiant interprets the words “at the same rate as delivery of like items called for under the contract” to refer to the rate of delivery under the original delivery schedule rather than under the modification. The original contract provided for Affiant to deliver 1550 bombs per month for 15 months, followed by a smaller quantity in the last month in order to complete the total contract amount of 24,497 bombs. The modification adopted an escalating rate, which required Affiant to deliver only 397 bombs in the first month, but in which the rate rose throughout the contract period until it reached 3000 bombs in the final month of the contract period.
Looking to the rate set forth in the original contract, Affiant argues that the proper rate for the option was 1550 bombs per month, which according to Affiant is “the same rate as delivery of like items called for under the contract.” The contracting officer, however, required a significantly higher rate. Looking to the rate of delivery in the last month of the original contract as modified, the contracting officer required Affiant to deliver 3000 bombs per month for seven months, followed by 3497 bombs in the eighth month.
Affiant’s interpretation of the option clause, which determines the rate of delivery based on the original contract rather than the contract as modified, presents difficulties, because the option clause links the rate of delivery with the time of delivery (“Delivery ... shall continue immediately after, and at the same rate as delivery of like items called for under the contract....”). If both the rate and the time of delivery under the option clause look to the original contract rather than the modification, then presumably Affiant would have been required to begin performing its obligations under the option clause immediately after the time that delivery was supposed to take place under the original contract. That would have required Affiant to begin performing under the option clause while it was still performing under the contract as modified, an awkward construction of the contract that neither party espouses. Yet, because the contract as modified calls for an escalating rate over the term of the option rather than a consistent rate of delivery, there is no single “rate of delivery” that is “called for under the contract” as modified. If the modified contract is used as the source of the “rate of delivery” for the option clause, the “rate of delivery” that is “called for under the contract” would seem to be either the average- rate of delivery over the entire schedule or an escalating rate tracking the escalating schedule of rates in the modified contract. If the average rate of delivery is selected, Affiant would be required to deliver 1884 bombs per month over 13 months, while if the escalating rate tracking the escalating rate in the modified contract is selected, Affiant would be required to deliver at a rate ranging from 397 bombs in the first month of the option period to 3000 bombs in the thirteenth and last month of the option period. In any event, reliance on either the original contract or the modified contract would produce a rate quite different from the contracting officer’s rate, which required Affiant to deliver bombs at an average rate of delivery of 3062 bombs per month.
While it is unclear whether the original rate of 1550 bombs per month, or the average modified rate of 1884 bombs per month, or the escalating modified rate ranging from 397 bombs to 3000 bombs is the correct rate in light of the poor fit between the option clause and the modification, what is clear is that the contracting officer’s rate of an average of more than 3000 bombs per month is not a plausible construction of the contract. The contracting officer’s rate for the entire option period is matched by only a single month in the original contract delivery rate as modified, and the government offers no plausible basis at all under the contract for *1275 the 3497 bomb delivery rate that the contracting officer required in the last month of the option period.
While we reject the contracting officer’s delivery rate as an impermissible construction of the contract, we conclude that it is not necessary, in the present posture of this case, to decide whether the 1550 rate, the 1884 rate, or the escalating rate of the modified contract is correct; it is enough to conclude that the contracting ■ officer’s rate is incorrect. The parties’ arguments, and our disposition of them, are not affected by the differences among the plausible candidates for the proper option rate, and since the option period has now expired under any of the plausible rates of delivery, a decision on that issue is not necessary for prospective purposes.
3
Aliant argues that an attempt to exercise an option outside its terms does not constitute a valid exercise of the option. We agree. The incorrect rate selected by the contracting officer in this case was not a scrivener’s error or an inadvertent omission of an option term. It was an affirmative requirement that departed from the terms of the option. The consequences of such a deviation from the proper terms of the option exercise are that the option clause imposed no obligations on Aliant and that its refusal to perform the option did not constitute a breach of the option clause. See United States v. T.W. Corder, Inc., 208 F.2d 411, 413 (9th Cir.1953) (“As a result of the [government’s] failure to exercise the option in accordance with its terms no bilateral contract for the purchase of the property came into existence.”); Uniq Computer Corp. ex rel. United States Leasing Corp. v. United States, 20 Cl.Ct. 222, 231-32 (1990); 3 Eric Mills Holmes, Corbin on Contracts § 11.8 (1996).
The government does not seriously challenge the general rule that an effort to invoke an option according to terms different from those set forth in the option clause does not validly invoke the option clause. Instead, the government contends that the disputes clause creates a different rule for government contracts that contain such a clause. While it is true, as we discuss below, that the disputes clause may create obligations even where the option clause does not, the obligations imposed by the disputes clause are properly analyzed in connection with that clause, not in connection with the option clause. With respect to the option clause, we conclude that the government’s failure to exercise the option in accordance with its terms in this case results in Aliant having no obligations under that provision of the contract. Our conclusion in that regard, however, does not answer the question whether Aliant had performance obligations under the disputes clause, a question to which we now turn.
B
In considering the question whether Alliant had performance obligations under the disputes clause, the first issue we must address is Alliant’s claim that the disputes clause does not apply to the performance of the option obligations because the option clause, even if properly invoked, would have created a second and separate contract between Aliant and the government. For that reason, Aliant contends, the “performance under the contract” required by the disputes clause does not encompass any obligations that might have been created by the purported option exercise.
Aliant’s position that an exercised option always creates a new and separate contract is untenable. Obligations arising from the exercise of an option are part of a new contract only when the option was the principal subject matter of the bargain, i.e., an option contract. See 3 Eric Mills Holmes, Corbin on Contracts § 11.1 (1996). That rule has consistently been applied to government contracts. See International Bus. Invs., Inc. v. United *1276 States, 21 Cl.Ct. 79 (1990); Ocean Tech., Inc. v. United States, 19 Cl.Ct. 288, 291 (1990); C.M.P., Inc. v. United States, 8 Cl.Ct. 743, 746-47 (1985).
The FAR definition of “option” supports the conclusion that options in government contracts generally create extensions of the obligations in the original contract rather than different obligations under a new contract. The FAR provides:
Option means a unilateral right in a contract by which, for a specified time, the government may elect to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract.
48 C.F.R. § 17.201 (emphasis added). Because the option in this case was not the principal subject matter of the original bargain, the parties’ rights and obligations under the option clause are properly considered as part of the original contract between Alliant and the government. In these circumstances, the disputes clause requirement that the contractor continue performance under the contract applies to the option obligations as construed first by the contracting officer and then by the reviewing court or board. See, e.g., Dynamics Corp. of Am. v. United States, 182 Ct.Cl. 62, 389 F.2d 424, 432 (1968).
Of course, the government may not, through a contracting officer’s decision, impose obligations on a contractor far exceeding any contemplated by their contract. If the government orders a “drastic modification” in the performance required by the contract, the order is considered a “cardinal change” that constitutes a material breach of the contract. See Air-A-Plane Corp. v. United States, 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969); see also General Dynamics Corp. v. United States, 218 Ct.Cl. 40, 585 F.2d 457, 462 (1978); Allied Materials & Equip. Co. v. United States, 215 Ct.Cl. 406, 569 F.2d 562, 563-64 (1978). Such a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause. See generally Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir.1992); In re Boston Shipyard Corp., 886 F.2d 451, 456 (1st Cir.1989). Alliant contends that the terms of the government’s attempted exercise of the option constituted such a drastic change from the actual performance obligations in the option clause of the contract that the purported exercise of the option was analogous to a “cardinal change” in the contract terms and therefore relieved Alliant of its obligations under the disputes clause.
We have already rejected Affiant's contention that the exercise of the option was untimely. On August 4, 1997, the contracting officer could have validly exercised the option at the correct rate for a 100% increase in quantity. The only ground on which Alliant can base its claim of a drastic change in the requirements of the option therefore is the difference between the rate of delivery insisted on by the contracting officer and that required by the option. Alliant contends that the increase in delivery rate to an average of more than 3000 bombs per month constituted a cardinal change in its option obligations that freed it from its obligations to perform under the disputes clause. We conclude that it did not.
The modified delivery schedule indicates that both parties contemplated performance at various rates including rates very close to the erroneous rate selected by the contracting officer. The contracting officer’s directive did not alter the total number of bombs that Alliant was required to process. If the contracting officer had required a significant change in the total number of bombs to be processed under the option clause, the contracting officer’s directive might have constituted a drastic modification in the terms of the option, but because we disagree with Alliant that the option period had ended at the time the government provided written notice of option exercise, the contracting officer was correct with regard to the total number of bombs to be processed under the option *1277 clause. Alliant’s cardinal change characterization is also weakened by the lack of evidence in the record that production at the higher rate for a shorter time would be more costly than lower production for a longer period. See Boston Shipyard, 886 F.2d at 456-57. Because the contracting officer’s requirements were not a drastic modification of the performance to which Alliant was subject under the option clause, the government did not materially breach the contract; Alliant was therefore subject to the obligations of the disputes clause.
Alliant’s obligations under the disputes clause are independent of its obligations under the option clause. Because we have determined that the disputes clause required Alliant to perform the option as directed pending resolution of its challenge to the contracting officer’s order, we hold that Alliant was obligated to deliver the option quantities until and unless it obtained a court order excusing it from its performance obligation. The Court of Federal Claims issued its declaratory judgment prior to the first delivery of option quantities required by the contracting officer’s decision. Alliant was therefore not obligated to perform at the contracting officer’s rate, but absent reversal or interim relief from this court, Alliant was required by the disputes clause to perform at the rate specified by the Court of Federal Claims. Because the Court of Federal Claims’ order was in force throughout the period in which the option was required to be performed, Alliant was required under the disputes clause to perform the option at the rate of 1550 bombs per month until the contractual total of 24,497 bombs was delivered.
In sum, we uphold the trial court’s decision that it had jurisdiction to entertain Alliant’s request for a ruling on its contract interpretation claim. On the merits, we reverse the order of the Court of Federal Claims to the extent that it declared the option to have been validly exercised. Nonetheless, we affirm the order of the Court of Federal Claims that Alliant was obligated under the contract to perform the option quantity at 1550 bombs per month, although we reach that conclusion based on the disputes clause rather than the option clause. We remand to the trial court for entry of an order in accordance with this opinion.
Each party shall bear its own costs for this appeal.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.