UNITED STATES of America ex rel.,
ERVIN AND ASSOCIATES,
INC., Plaintiff,

v.

The HAMILTON SECURITIES
GROUP, INC., et al.,
Defendants.

Nos. CIV.A. 96–CV–1258(LFO),
CIV.A. 99–CV–1698(LFO).

United States District Court,
District of Columbia.

Jan. 7, 2004.

Aaron L. Handleman, Michael Philip Freije, Eccleston & Wolf, Daniel Matthew Hawke, Securities & Exchange Commission, Joseph P. Hornyak, Renee Catherine Macri, Sonnenschein, Nath & Rosenthal, Mark D. Polston, Washington, DC, Neil V. Getnick, Getnick & Getnick, New York City, Wayne Gormly Travell, Leach Travell, McLean, VA, for Plaintiff.

Brian Arthur Coleman, Kenneth E. Ryan, Michael J. McManus, Drinker, Biddle & Reath, A. Scott Bolden, Reed Smith, John J. Fausti, Kathleen Heenan McGuan, Washington, DC, for Defendants.

## MEMORANDUM

OBERDORFER, District Judge.

This *qui tam* action was filed on June 6, 1996 on behalf of the United States by plaintiffs John Ervin and Ervin Associates, Inc. (collectively, Ervin) against several entities, including Hamilton Securities Group, Inc. (Hamilton).[1] Over the course of four days of trial, Ervin submitted testimony and documentary evidence against Hamilton and rested. Thereupon, Hamilton moved for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c).[2] Ervin and Hamilton filed memoranda and argued the motions pro and con.

Rule 52(c) was added to the Federal Rules in 1991 as the procedural successor to Rule 41(b). Like its predecessor, Rule 52(c) authorizes a district court to enter judgment on a claim at any time that it can appropriately make a dispositive finding of fact on the evidence. Advisory Committee Notes to Rule 52(c). In ruling on a Rule 52(c) motion, a district court may not draw any special inferences in favor of the non-movant, Ervin in this case. Instead, the court must weigh the evidence, resolve any

1. The other defendant is Williams, Adley & Co. (Williams). On the eve of trial, Ervin and Williams reached a settlement agreement. By consent of the parties, Ervin postponed presenting its case in chief against Williams. The United States is reviewing that settlement agreement and to date has apparently not approved the proposed settlement agreement. This memorandum addresses only those of Ervin's claims that are against Hamilton.

2. Federal Rule of Civil Procedure 52(c) provides:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule

conflicts in it, and decide where the preponderance lies. *Mitchell v. Baldrige*, 759 F.2d 80, 82 n. 1 (D.C.Cir.1985) (ruling on a motion under former Rule 41(b)); *Aetna Casualty and Surety Co. v. Arlington Hospital Assoc.*, Civil Action No. 88–1290, 1989 U.S. Dist. LEXIS 11566 (D.D.C. Sept. 27, 1989) ("A Rule 41(b) motion differs from a directed verdict motion in that no evidentiary presumptions are made for the nonmoving party" based on that party's nonmovant status).[3]

The testimony, documentary evidence, briefs, and oral arguments on Hamilton's motion persuade me that Hamilton is entitled to judgment on partial findings with respect to Count VII of the Second Amended Complaint, as explained in the following findings of fact and conclusions of law concerning that Count. Accordingly, an accompanying order grants Hamilton's motion with respect to Count VII.[4] This memorandum presents findings of fact and conclusions of law regarding a dispositive element of the order dismissing Count VII, which concerns the so-called West of Mississippi note sale.

## I. FINDINGS OF FACT

Throughout the 1970s and 1980s, the United States Department of Housing and Urban Development (HUD), as part of an effort to promote broad home ownership, insured the mortgages of certain individuals and entities. Often, when the insured failed to make payments owed on the mortgage, HUD assumed the mortgage and the related property or properties. By September 1993, HUD had accumulated a portfolio of over $408 *billion* dollars. This massive real estate management responsibility was a drain on HUD's various other responsibilities. In 1993, in order to allow HUD to "better fulfill its mission," HUD initiated a program to restructure its portfolio. Hamilton Ex. 7 at HUD/EE 817. As part of this program, HUD sought to sell its inventory of single family and multifamily HUD-held mortgages and HUD-held properties. *See id.* Because HUD had never before engaged in a massive sell-off of mortgage assets and apparently did not have the expertise in-house to manage such a project, HUD decided to contract the note sale operations to the private sector.

In 1993, in response to HUD's request for proposals, Hamilton submitted a bid for a contract as HUD's financial advisor, under which Hamilton would assist HUD in developing and implementing a pioneer program to dispose of HUD-held mortgage notes through public auctions. On September 30, 1993, HUD awarded to Hamilton contract no. DU100C000018161, also known as the "first financial advisor contract." *See* Hamilton Ex. 8. Hamilton's responsibilities in its role as financial advisor to HUD included "all aspects of running asset sales and getting *supportive services* to assist in doing that such as conducting analyses, strategizing approaches to sales, [and] due diligence." Tr. 10/29/03 PM at 13, ln 5–16 (emphasis supplied). The goal of these sales was to realize the maximum revenue to HUD. Recognizing the novelty and complexity of the calculations involved with the auction and with the conducting of the auction process, Hamilton reinforced its capabilities by subcontracting with two nationally

---

3. The trier of fact, of course, retains the authority, if not the obligation, to draw reasonable inferences from the facts found.

4. In addition, the order for reasons briefly there stated, grants the motion with respect to Counts I, III, IV, V, VI, and VIII of the Second Amended Complaint and denies the motion with respect to Counts II, IX, XIII, XIV, XV, and XVI.

known concerns whose names spoke for themselves: Bell Laboratories (Bell Labs), a major scientific research facility, and the accounting firm of Coopers & Lybrand.

### Hamilton's Subcontracts with Bell Labs and Coopers & Lybrand

Bell Labs (now Lucent Technologies) is a scientific research facility whose scientists have won six Nobel prizes and nine U.S. Medals of Science. *See http:// www.bell-labs.com/about/awards.html; see generally* Fed.R.Evid. R. 201(b). By 1993, Bell Labs had a reputation within the financial services industry for the quality of its so-called "optimization models." Tr. 10/30/03 PM at 114, ln. 14–16. Because of Bell Labs' reputation, and because Hamilton believed that achieving the revenue maximizing goal could be accomplished by use of a sound effective computer formula that maximized the yield of the complex auction sales, Hamilton approached Bell Labs regarding the possibility of being a subcontractor for the HUD auction work. *See id.*[5] Hamilton eventually employed Bell Labs as a subcontractor to run an optimization model developed by Bell Labs. The optimization model was a computer-operated algorithm designed to select as winners that combination of bids which represented the maximum potential revenue to HUD.

Coopers & Lybrand (now Pricewaterhouse Coopers) is a major internationally positioned consulting firm that regularly provides audit services, financial analysis, and tax advice to large corporations. *See* Fed.R.Evid. 201. Hamilton retained Coopers & Lybrand to manage certain logistics aspects of the auctions, such as security and bid processing.

### The West of Mississippi Note Sale

The first series of assets designated for auction represented an unpaid principal balance (UPB)[6] of approximately $6.2 billion. The first subgroup of those assets designated for sale was HUD's inventory of notes secured by properties in states located West of the Mississippi River. *See* Ervin's Ex. 255. In that sale, known as the "West of Mississippi" note sale, HUD auctioned off mortgages on loans with a collective UPB of approximately $622 million secured by 148 properties.

Before the West of Mississippi note sale, neither HUD, Hamilton, Bell Labs nor Coopers & Lybrand had ever attempted a note sale auction that required such special attributes. For example, the success and cost-effectiveness of the auction would obviously be enhanced by attracting as many, and as large as possible, serious bids. The written terms of the bid package provided by Hamilton on behalf of HUD to prospective bidders on the West of Mississippi notes authorized bidders to specify a "bid floor." The bid floor allowed a bidder to condition its bids on award to the bidder of a minimum amount of notes, measured by the UPB due on the notes. If a bidder was not selected by the optimization model as the winner of notes with a combined UPB equal to or greater than its bid floor, that bidder would be awarded no notes.[7]

---

5. Grace Huebscher, an executive at Hamilton in 1995, testified, regarding how it was that Bell Labs was selected, that "Bell Labs was known for its optimization techniques especially used in the airline industry. So we approached them and it made sense and we subcontracted with them." Tr. 10/30/03 PM at 114, ln. 11–15.

6. UPB is equal to the amount of outstanding (unpaid) principal balance owed on the given mortgage note.

7. Tr. 10/31/03 PM at 147, ln 18–24; Ervin Ex. 77 at p. 2, ¶ 1. For example, if a bidder specified a bid floor of $100 million UPB, but the optimization model selected that bidder as the winner of notes with a UPB totaling only $90 million, that bidder would be awarded no

The bid package also required of each bidder a cash deposit, via wire transfer, of five percent of the bid price, or, in the case of a bidder for more than one set of mortgages, five percent of the bidder's largest bid. *See* Ervin's Ex. 95. This deposit requirement deprived each bidder of the use of the deposited funds until the completion of the auction. Hamilton offered no interest on these deposits.

Arrangements made by Hamilton limited the time that bidders, including losing bidders, were so deprived. Hamilton engaged Bell Labs with the contractual requirement that Bell Labs complete and transmit its optimization calculations to Hamilton (for presentation to HUD) within two days of the close of bidding so that the deposits submitted by the losing bidders would be returned shortly thereafter.

On September 19, 1995, Coopers & Lybrand, as subcontractor to Hamilton, accepted bids on behalf of HUD for the West of the Mississippi note sale. As related in more detail below, Coopers & Lybrand transmitted the bids to Bell Labs on September 19, 1995, and on September 21, 1995, Hamilton reported the auction results to HUD. Shortly thereafter, HUD returned the bidders' deposits to the losing bidders.

**Five Key Players in the West of Mississippi Note Sale**

Ervin's presentation at trial concerning the West of Mississippi note sale focused on the role of five individuals: Grace Huebscher, Robert Robinson, Henry Fan, Michael Brocks, and Sol Schindler. Grace Huebscher was a Hamilton executive in charge of managing the West of Mississippi sale. She was ultimately responsible for managing the auction process, presenting final results to HUD, and subsequently

helping to close the transactions with the successful bidders. Huebscher resigned from Hamilton in 1996.

Robert Robinson was Hamilton's Assistant Treasurer, a member of Hamilton's Board of Directors, and responsible for several sub-tasks on the West of Mississippi sale. He was the principal point of contact on the sale between Hamilton and subcontractor Bell Labs. Robinson resigned from Hamilton in January 1996.

Henry Fan, an Massachusetts Institute of Technology PhD, began his employment with Hamilton in August 1995. The West of Mississippi sale was Fan's first note sale project work for Hamilton. Fan performed tasks related to the note sale *ad hoc* at Robinson's direction.

At the time of the West of Mississippi sale, Michael Brocks, on the staff of Coopers & Lybrand, had been a certified public accountant for approximately twelve years. His primary role in the West of Mississippi sale was to establish procedures and protocols so that bids could be processed in an orderly and secure fashion. Brocks was not responsible for communicating with Bell Labs. Through his interactions with Fan leading up to the West of Mississippi note sale, Brocks came to know Fan personally and to respect him.

Sol Schindler of Bell Labs was head of its subcontracting work for Hamilton during the West of Mississippi sale. In that capacity, Schindler managed the optimization model. Later, after the West of Mississippi sale, Schindler suffered a heart attack and did not work on HUD note sales subsequent to the West of Mississippi note sale or interact with those at Bell Labs who did work on the subsequent HUD note sale auctions. *See* Ervin's Ex. 77.

---

notes. On the other hand, if that bidder was selected as the winner of notes with a total

UPB of $110 million, it would be awarded all of those notes.

### Receipt of The Auction Bids

On September 18–19, 1995, bidders for the West of Mississippi mortgage loans placed their bids in a designated room (the "bid room") at the ANA Hotel in Washington, D.C. Present in the bid room on the day of the auction were Brocks, Fan, and others. On bid day, Hamilton received 400 bids from 73 different bidders for the approximately $622 million in UPB worth of mortgages, five percent of which would have represented approximately at least $30 million in deposits. After the bid period closed, Coopers & Lybrand, in its role as subcontractor, transmitted the bid card data to Bell Labs.

### The First Optimization Report

To calculate the auction results promptly, Bell Labs applied a computerized optimization model to the data from the bid cards. For the West of Mississippi sale, Bell Labs performed its first run of the optimization model on the afternoon of September 20, 1995, the day after the auction. Later that afternoon, Schindler of Bell Labs provided a computerized report of the results to Robinson of Hamilton. This report showed gross revenue of $372,633,508.82 from the sale, equal to 59.88% of the UPB on the mortgages being offered in the note sale. *Id.* at 1, 2. The report listed the ALI pool bid # 3 as the winner of $130,412,240.95 UPB of assets with a bid of $110,247,717.68. *See* Hamilton's Ex. 44 at 2, 5. The report also showed that bidder 119 had not been awarded any assets—because it did not meet its bid floor of $145 million. *See* Hamilton's Ex. 44 at 1. Schindler's e-mail transmitting this information to Robinson stated: "This looks suspicious and should be checked." *Id.* at 1.

In response, and without "specifically understand[ing]" the problem that Schindler was communicating, Robinson immediately, and without consulting others at Hamilton, instructed Schindler to re-run the optimization model. Tr. 10/21/03 PM at 151, ln. 16. As the Hamilton executive with the primary responsibility for overseeing Bell Labs' work concerning the optimization model, Robinson was not required to consult with or obtain direction from any other Hamilton employee before instructing Bell Labs to re-run the optimization model, and did not do so.

In instructing Schindler, Robinson directed that the model used by Bell Labs be a "UPB" model that calculated the winning bids as a function of the UPB, rather than as "revenue model," pursuant to which the results would be calculated as a function of the gross revenue generated by the bids. *See* Ervin's Ex. 77. Bell Labs advised that there was no UPB model then in existence and that it would take "a few days" to develop such a model. *Id.* Robinson responded that this delay would be "not acceptable." *Id.* Later on September 20, 1995, Bell Labs, having worked further on the problem, indicated to Robinson that, within a day, "a UPB model could be approximated by converting the bidders' floors (as expressed in UPB) into revenue, and then re-running the revenue model." *Id.* Robinson instructed Bell Labs to calculate the bid results employing this model.

On the evening of September 20, 1995, following Robinson's instruction, Bell Labs re-ran the optimization model. *See* Hamilton's Ex. 45 at 1. Schindler sent the results of this run to Robinson the following day, September 21, 1995. *Id.* In a cover e-mail, Schindler noted "I changed the minimum revenue to minimum UPB by prorating as a temporary fix." *Id.* Schindler's e-mail continued: "Changing minimum revenue to minimum UPB had a significant impact on the winners." *Id.* Schindler concluded categorically that the prorated results established the proceeds of the West of Mississippi note sale to be $622 million, "with-

in $1" of optimal. Tr. 10/31/03 at 208, ln. 1–6.; Ervin Ex. 99 at LUC001200.[8] In reliance on that statement, Robinson reasonably believed that this second optimization calculation solved the problem with the West of the Mississippi note sale, and, accordingly, on September 21, 1995, reported the results to HUD.

A side effect of Schindler's "temporary fix" of September 21, 1995 was that ALI # 3 was no longer on the list of winning bids. *See* Hamilton's Ex. 45. In December 1996, Hamilton conducted an internal investigation into the discrepancies between the first Schindler / Bell Labs optimization calculation and the subsequent "temporary fix" that displaced ALI # 3. The investigation determined that Hamilton had incorrectly defined bid floors for Bell Labs, and that a correct definition would have made the ALI # 3 bid the winner. *See* Ervin Ex. 77 at p. 2 ¶¶ 2–4; *see also* Ervin's Ex. 89 at 4 (unnumbered) (showing, for example, that ALI offered 84.53786% of UPB for a pool of 39 mortgages).

### The Fax from Brocks to Fan

After the West of Mississippi sale results had been determined, Brocks returned to his office in Pittsburgh. Then, as he recalled at trial, he:

> started thinking that I remember seeing a bid that was sizable, that stuck out in my mind during the auction. And I wondered why they didn't win. I just thought they should win. So I prepared this Excel analysis which is on Page 2 of [Plaintiff's Exhibit 78] and from—again, it appeared that ALI should have

won because their bid exceeded the others by $2 million.

Tr. 10/30/03 PM at 101, ln. 25—102, ln. 7.

Thereafter, Brocks sent a fax to Fan at Hamilton. Brocks' fax included an Excel spreadsheet comparing the winning bids, as determined by Bell Labs, with ALI # 3 for each of the notes covered by the ALI # 3 bid. *See* Ervin Ex. 78 at 0022652. In this spreadsheet, Brocks showed, mortgage-by-mortgage, the winning bids that might have been displaced if ALI # 3 had been included in the optimal result. The winning bid in Brocks' version of the optimization report yielded $2,554,001.00 less revenue than the ALI # 3 bid.

### Fan's Response to Brock's Fax

After receipt of the fax from Brocks, Fan spoke with Brocks by telephone. Fan stated that while he understood what Brocks was trying to do, Brocks' calculations would have to consider the effect of bid floors and other bids to get a truly correct answer. Brocks did not know about Bell's first optimization report that included ALI # 3 in the optimal solution. Brocks did not take any further actions regarding the West of the Mississippi bid results following this conversation.

There is a factual dispute as to how difficult it would have been to calculate the optimal bids, based on UPB, without the benefit of the computerized optimization model. Ervin's counsel argued at trial that these calculations could have been done relatively easily by hand. However, Bell Labs, in December 1996, *with* the computer optimization model, performed the optimization calculations in approximately one week. *See* Tr. 10/30/03 PM at 226. Brocks testified that to perform such calculations without the optimization model

---

8. Schindler's e-mail to Robinson stated, in part: "As you requested, I changed the minimum revenue to minimum [UPB] by prorating as a temporary fix. The attached reports [include] ... [t]he first alternate summary report, which indicates that there is an alternate solution within the cutoff of $1 (actually $0.36 higher)." Ervin Ex. 99.

could take weeks or even months, if they could be done at all. Tr. 10/30/03 PM at 107, ln 23—108, ln 10. Given that it took Bell Labs about a week with the computerized algorithm, I find that Brocks' belief was reasonable. Brocks did not perform or attempt to perform further calculations regarding this matter.

Brocks did not inform anyone of his fax (or its substance) other than Fan and one junior Hamilton employee[9] at the time of the sale, nor did Brocks expect Fan to discuss the issue with anyone else, again, because, Brocks testified, Fan's explanation "made sense." Tr. 10/30/03 PM at 108, ln 22—109, ln 7; Tr. 10/31/03 AM at 172, ln 6-13. After speaking with Fan, Brocks did not believe the problem required further investigation.

### Hamilton Reports the Results to HUD

The results of the West of Mississippi note auction sale, as calculated by Bell Labs' second optimization report, were reported to HUD on Friday, September 22, 1995. Hamilton reported gross proceeds, as determined by the optimization model, of $385,196,928.49. HUD relied upon Hamilton's statements in choosing the optimal bidders on its loan sales. The bidders awarded assets were notified the same day that the results were reported to HUD. ALI #3 was not reported as a winning bid.

### The Manhattan Project

On June 6, 1996, the plaintiffs in the instant *qui tam* action filed (under seal) a complaint naming Hamilton as a defendant based, *inter alia*, on allegations surrounding the West of Mississippi sale. Subse-quently, on or about October 24, 1996, Hamilton employee Rick Wolfe discovered an inconsistency between the terms of the West of Mississippi bid package and the formula Bell Labs had used to optimize the results in that and subsequent note sales. On November 11, 1996, an article appeared in the U.S. News and World Report criticizing Hamilton's conduct of the note sales. *See* Hamilton's Ex. 126.[10]

In November 1996, Hamilton assembled a team, nicknamed the "Manhattan project," to investigate the optimization results reported to HUD in the West of Mississippi and other note sales. Robinson was not part of the Manhattan project team because he was no longer a Hamilton employee. Robinson was interviewed by Hamilton Chief Financial Officer Michael Dietz as part of the Manhattan project.

The Manhattan project team asked Bell Labs to re-run optimization computations regarding the West of Mississippi sale. Bell Labs required approximately one week to run that model.

Bell Labs' resulting optimization report dated December 6, 1996, concluded that the "true" optimal result for the West of Mississippi bids was $387,569,235.93. *See* Hamilton's Ex. 198. Bell Labs also concluded that the true optimal result for the West of Mississippi sale would have made ALI's pool bid #3 a winner. Based on Bell Labs' computations, Hamilton's Manhattan project team concluded that the $385,196,928.49 yield reported to HUD for the West of Mississippi sale, was $2,372,307 (rounded off to the dollar figure) less than optimal.

9. In addition to Fan, Brocks also sent the fax to Christine Lord, a junior Hamilton employee who sat near the fax machine in Hamilton's offices. Brocks sent Lord the fax so that she could transmit the document to Fan.

10. There is pending before the court Civil Action No. 99–CV–1698 (LFO), an action by Hamilton against Ervin charging that Ervin was the source of these published reports and that Ervin tortiously interfered with Hamilton's contract with HUD.

**Hamilton Reports to HUD**

On December 20, 1996, Hamilton submitted a report to HUD officials Nic Retsinas and Kathy Rock entitled "Report on Optimization." Ervin's Ex. 77. In the Report on Optimization, Hamilton explained that a discrepancy in the floor bid instructions that a Hamilton employee had conveyed to Bell Labs caused errors. According to this report:

> West of Mississippi MF Sale: The sale produced revenue of $385,196,928 and the Lucent/Bell Labs result generated using the UPB floor is $387,569,235. The difference is $2,372,307 or 6/10ths of one percent.

*Id.*

Attached to the December 20, 1996 report was a one-page document entitled "West of the Mississippi Bid Analysis." *Id.* The report shows the "changes in asset mix" of five institutional bidders that submitted bids for multiple assets. The report does not identify specific bids submitted by these bidders that should or should not have been included in the optimal result. The report also shows five individual bids that were "winners . . . who should not have won." *Id.* The report shows that had ALI's bid been a winner, it would have been awarded $91,649,825 in UPB. *Id.*

**HUD Terminates Hamilton's Contract**

By memorandum dated October 17, 1997, Fair Housing Authority Commissioner Nicolas Retsinas requested that the Office of Procurement and Contracts terminate Hamilton's contract and take all appropriate action to recover from Hamilton the lost revenue caused by Hamilton's errors on the West of Mississippi sale. *See* Hamilton Ex. 26. Upon learning of Hamilton's errors in the West of Mississippi and later note sales [11]—as revealed in the Manhattan Project reports—HUD procurement officer Annette Hancock consulted with her superiors and legal counsel and terminated Hamilton's contract. Shortly after the termination of Hamilton's contract, then-HUD secretary Andrew Cuomo suspended the federal government's note sale program. In the meantime, the instant *qui tam* action remained pending and sealed until 2000, proceeded with discovery, and, in October 2003, went to trial.[12]

## II. CONCLUSIONS OF LAW

The False Claims Act, 31 U.S.C. § 3729 *et seq.*, establishes treble damages for "reverse false claims." A reverse false claim may be sustained against one who "*knowingly* makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government." 31 U.S.C. § 3729(a)(7) (emphasis supplied). The key issue posed by

---

11. The other sales included the North and Central note sale, the subject of Count IX of the Second Amended Complaint. Hamilton has also moved for judgment on that Count. The order accompanying this memorandum denies the motion with respect to Count IX, which concerns the North and Central note sale. That sale presents facts distinct from the West of Mississippi note sale, specifically greater evidence of reckless disregard of the falsity of the representation that the results reported to HUD were "optimal."

12. Several related lawsuits were also filed regarding the West of Mississippi note sale. In 1998, Hamilton filed an action against HUD in the United States Court of Federal Claims, seeking payment of certain outstanding accounts. *See Hamilton Securities Advisory Servs., Inc. v. United States*, No. 98–169 (Fed.Cl). The United States filed a countersuit (separate from the instant claim) against Hamilton for $3,883,551 in revenue lost. *See id.* Of this amount, $2,372,307 represents the damages allegedly caused by Hamilton's errors on the West of Mississippi sale. Portions of that suit are still pending.

Hamilton's 52(c) motion is whether Ervin proved the "knowingly" requirement of the statute. As discussed further below, I conclude that Ervin failed to carry this burden.

To prove that Hamilton "knowingly" presented a false or fraudulent claim, Ervin was required to show that Hamilton

> (1) ha[d] actual knowledge of the information;
>
> (2) act[ed] in deliberate ignorance of the truth or falsity of the information; or
>
> (3) act[ed] in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b).

Concerning the West of Mississippi note sale, Ervin does not attempt to argue that Hamilton had actual knowledge of any false statements, or that Hamilton acted in deliberate ignorance of the truth or falsity of information relayed to HUD. Rather, Count VII of the Second Amended Complaint alleges, and Ervin set out at trial to prove, that Hamilton and its subcontractors "act[ed] in *reckless disregard* of the truth or falsity of the auction optimization results" for the West of the Mississippi note sale. Tr. 10/29/03 AM at 21, ln 18–20 (emphasis supplied).[13]

█ The "reckless disregard" prong of the definition for the term "knowingly" as used in the False Claims Act, 31 U.S.C. 3729 *et seq.*, was enacted in a 1986 amendment to the federal statutory code. As described by what appears to be the only congressional report accompanying the bill:

S. 1562 defines this obligation as to make such inquiry as would be reasonable and prudent to conduct under the circumstances to ascertain the true and accurate basis of the claim. Only those who act in gross negligence of this duty will be found liable under the False Claims Act.

\* \* \* \* \* \*

the constructive knowledge definition attempts to reach what has become known as the ostrich type situation where an individual has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted. While the Committee intends that at least some inquiry be made, the inquiry need only be "reasonable and prudent under the circumstances", which clearly recognizes a limited duty to inquire as opposed to a burdensome obligation.

S. Rep. 99–345, at 20, 1986 U.S.C.C.A.N. 5266, 5285 (internal quotation marks omitted).

According to our Court of Appeals, reckless disregard, as used in the False Claims Act, "lies on a *continuum between gross negligence and intentional harm.*" *United States v. Krizek*, 111 F.3d 934, 941 (D.C.Cir.1997) (internal citation omitted) (emphasis supplied). The "best reading of the [False Claims Act] Act defines reckless disregard as an extension of gross negligence," an "extreme form of gross negligence." *Id.* at 942; *see also id.* at 941–42 (upholding district court's application of standard as expressed as "gross negligence plus"); *accord United States ex rel.*

---

**13.** In False Claims Act actions, statements of the subcontractor, when submitted by the general contractor, may serve as a basis for liability against the general contractor. *See, e.g., Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 793 (4th Cir.1999) ("where the prime contractor allegedly knows that a material certification by a subcontractor was false, we find as a matter of law that the prime contractor has adopted the subcontractor's certification by submitting it to the government."); *see also United States ex. rel. Roby v. The Boeing Co.*, 73 F.Supp.2d 897, 904 n. 11 (S.D.Ohio 1999).

*Aakhus v. Dyncorp,* 136 F.3d 676, 682 (10th Cir.1998); *UMC Electronics Co. v. United States,* 43 Fed.Cl. 776, 792 n. 15 (1999). The severity of conduct required to constitute "reckless disregard" underscores that innocent mistakes, mere negligence, or even gross negligence (without more) are not actionable under the False Claims Act. *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999).

Ervin argues that the alleged extreme gross negligence by Hamilton (including that of its subcontractors Cooper & Lybrand and Bell Labs) at both the *systemic* and *individual* levels caused HUD's loss on the West of Mississippi note sale. Neither argument is ultimately persuasive.

■ Concerning the systemic level, Ervin makes several related arguments. First, Ervin argues that Hamilton failed to install a system by which concerns, such as those voiced by Brocks' fax, were to be routed to the responsible personnel. This argument is without merit. Ervin cites no authority, nor has research discovered any, for the proposition that failure to implement proper channels of communication may constitute gross negligence, let alone extreme gross negligence under the False Claims Act.

■ Similarly, Ervin argues that it was gross negligence in the extreme for Hamilton to deploy only one employee, Robinson, to oversee Bell Labs' subcontracting work. However, Ervin did not attempt to impeach the credentials of Robinson or Schindler of Bell Labs, other than to note that the West of Mississippi note sale was Schindler's first note sale work. Indeed, it was the first HUD note sale for all concerned. Nor did Ervin introduce any evidence as to the number of Hamilton employees, the availability of other personnel, or the industry practice for communications systems in analogous projects. Con-

sidering the entire context, Ervin has not established that Hamilton's staffing arrangement evidenced an "extreme form of gross negligence." *Krizek,* 111 F.3d at 941.

■ Ervin next argues that Hamilton and its subcontractors acted with reckless disregard because they failed to verify the accuracy of Bell Labs' results. Ervin relies on *United States ex rel Compton v. Midwest Specialties, Inc.,* 142 F.3d 296 (6th Cir.1998). In that case, the contract between the federal government and a supplier required that the goods in question be tested. Knowing the goods had not been tested, and without knowing *de facto* whether the goods otherwise conformed to specifications, the supplier delivered the goods to the government. *See id.* at 303–04. The Sixth Circuit held that the supplier was so reckless as to whether the goods conformed that it had "knowingly" made a false claim to the government. *Id.*

Hamilton's conduct does not fall to this level. Hamilton did not represent that it would specifically test the results of the optimization process to verify that it had indeed yielded the "optimal" result. Unlike in *Compton,* it was therefore not negligent in the extreme, if negligent at all, for Hamilton to rely on an organization like Bell Labs and forego attempts to further test Bell Labs / Schindler's temporary fix. Proof of reckless disregard requires much more than errors, even egregious errors. Hamilton, due to the complexity of the pioneer, massive, and time-sensitive note sale transaction, subcontracted the work of developing an optimization formula to a prestigious scientific laboratory and the task of operating the auction itself to Coopers & Lybrand, a major financial services firm. Ervin makes no attempt to argue that Bell Labs or Coopers & Lybrand were an inappropriate choice for the work

each was respectively subcontracted to do, nor does Ervin attempt to impeach either subcontractors' credentials. While more extensive quality controls could have been in place (as is always the case), I find and conclude that the failure of Hamilton and its employees and subcontractors to create a system better attuned to the possibility of error in the pioneer West of Mississippi sale did not constitute "reckless disregard" within the meaning of the False Claims Act as construed by our Court of Appeals.

The evidence does not show actionable disregard for the truth or accuracy of the optimization results. The record does, of course, show that Hamilton and Bell Labs, specifically Robinson and Schindler, failed to identify errors in the optimization model for the West of Mississippi note sale. However, there is no evidence that Schindler was either under-qualified or unconscientious in trying to get the model right; it was he who, appropriately, suggested that the first optimization run be checked. And Robinson, qualified and also acting in good faith, approved the running of the second optimization report unilaterally and quickly. Schindler then inspected the results of the second optimization run and pronounced it accurate to within one dollar on a $622 million dollar sale. Given Schindler and Bell Labs' expertise, and the importance of time-sensitivity in the transaction, it was not gross negligence "plus" for Robinson to rely on the representation of a Bell Labs scientist to this effect. *See Krizek*, 111 F.3d at 941–42. Similarly, although Hamilton gave erroneous instructions regarding the calculation of the West of Mississippi bid floors, it is obvious only in hindsight that those instructions should have been rechecked prior to their transmission. Indeed, even Bell Labs did not identify the bid floor calculation instructions as problematic at any time during the West of Mississippi sale. In the final analysis, although Bell Labs, based on the

erroneous bid floor instructions provided by Hamilton, produced ultimately erroneous optimization results, given all the circumstances here, "[e]rrors based simply on faulty calculations or flawed reasoning may be excused.... Proof of one's mistakes or inabilities is not evidence that one is a cheat.... Bad math is no fraud." *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992).

Ervin also argues that the evidence on "individual level" negligence proved recklessness. Ervin relies on the D.C. Circuit's decision in *Krizek*, 111 F.3d 934. That case upheld the district court's finding of reckless disregard in a *qui tam* action involving the submission of false medical bills. The panel in *Krizek* identified the factors that supported the finding of reckless disregard: the defendant "completed the submissions with little or no factual basis," made "no effort to establish how much time" was spent with any particular patient, "failed utterly" to review bills submitted," and that "there were a number of days within the seven-patient sample when even the shoddiest record-keeping would have revealed that false submissions were being made—those days on which the [defendants'] billing approached twenty-four hours in a single day." *Id.* at 941–42.

■ The facts of this case are in significant contrast. The submission of the optimization results by a specialized subcontractor had a significant factual basis: quantities of data, including properties bid on, bid floors, and bid amounts, were entered corresponding to each of the 400 bids in the West of Mississippi note sale. Those pieces of data were then processed by a computer algorithm run by Bell Labs. Ervin focused at trial on the reactions by the individual employees at Hamilton and its subcontractors regarding the fax sent

by Brocks to Fan and the information concerning the error in the optimization calculations on the West of Mississippi note sale, particularly Brocks and Robinson.[14] As discussed below, Ervin has not shown reckless disregard by either of these individuals.

Concerning Brocks' conduct, it was not grossly negligent for Brocks to contact only Fan. The optimization analysis was not Brocks' responsibility. He had worked with Fan on the nuts and bolts of the auction and had developed a favorable impression of Fan.

Nor was Brocks' conclusion following his conversation with Fan reckless disregard. After Brocks spoke with Fan regarding his fax, he did not believe there was any type of problem requiring further investigation. Fan's answer—that Brocks' calculation would have to consider the effect of bid floors and other bids in order to get a truly correct answer—"made sense." Tr. 10/30/03 PM at 108, ln 22—109, ln 7; Tr. 10/31/03 AM at 172, ln 6–13. Further, to properly perform such calculations without the benefit of the Bell Labs algorithm would have taken weeks or even months, if it could be done at all. *See* Tr. 10/30/03 PM at 107, ln 23—108, ln 10. Given all the circumstances and the time-sensitive nature of the note sale, Brocks' conclusion that to perform the calculation would be too time-consuming was not grossly negligent.

Nor did Robinson's conduct concerning the West of Mississippi reported error on the first optimization run constitute gross negligence. With regard to the bid floor instruction error, Robinson, as Hamilton's primary contact with Bell Labs, after consulting with Bell Labs on September 20, 1995, could reasonably have believed that the problem with the West of Mississippi sale had been "fixed" and that action results presented to HUD were within $1 of the perfectly optimal solution. This belief was supported by his receipt of an e-mail from Schindler representing the results to have reduced error consequences to a *de minimis* level. The failure of Robinson to pursue further the concerns expressed by Brocks and Schindler was not grossly unreasonable in the context of the West of Mississippi transaction, whatever the implications of Hamilton's failure to learn from that experience in the context of future note sale transactions.[15]

### III. CONCLUSION

I find and conclude that the evidence concerning the West of Mississippi note sale does not carry Ervin's burden of proving that Hamilton or its subcontractors acted with reckless disregard regarding the truth or falsity of the reports of the optimal results of the West of Mississippi note sale auction. In light of the foregoing, it is not necessary, to address other issues raised by Hamilton's motion. For the reasons stated above, an accompanying order **grants** Hamilton's 52(c) motion with

---

14. Ervin has also suggested that Fan's conduct evidenced reckless disregard. However, Ervin did not introduce any evidence as to what Fan's actions were, if any, aside from establishing that Brocks did not know of any follow-up by Fan in response to Brocks' fax. This showing is not enough to establish reckless disregard.

15. In addition, although the Manhattan project plainly should have been commenced pri-

or to the sales subsequent to the West of Mississippi note sale, it is a minor plus for Hamilton that it eventually disclosed the correct information to the government. *See United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("That a defendant has disclosed all the underlying facts to the government may, the United States in its brief concedes, show that the defendant had no intent to deceive.").

respect to Count VII of the Second Amended Complaint.

*ORDER*

It is this 7th day of January 2004 hereby

ORDERED: that, for reasons stated in the accompanying memorandum, defendant Hamilton's motion for partial judgment with respect to Count VII of the Second Amended Complaint is **GRANTED**, and it is:

FURTHER ORDERED: that Hamilton's motion for partial judgment with respect to Counts I, III, IV, V, VI, and VIII of the Second Amended Complaint is **GRANTED** because Ervin failed to identify or introduce evidence in either its pretrial statement or at trial in support of the allegations contained in these Counts. And it is:

FURTHER ORDERED: that Hamilton's motion is **DENIED** with respect to Count IX, related to the North and Central note sale. That transaction occurred arguably after Hamilton should have known enough about all of the errors and problems with the West of Mississippi sale to place the burden on Hamilton to demonstrate that the errors' replication is not actionable gross negligence in the extreme. And it is:

FURTHER ORDERED: Hamilton's motion is **denied** with respect to Count II (related to the Single Family Offering), Counts XIII and XIV (related to the Williams, Adley 8(a) contract), and Counts XV and XVI (related to the cross-cutting contract). And it is:

FURTHER ORDERED: that all pending evidentiary objections are overruled. And it is:

FURTHER ORDERED: that the qui tam trial is scheduled to resume on *Monday, March 15, 2004 at 10:00 a.m. in Courtroom 3,* at which time Hamilton may put on its case in defense unless the parties have reached a settlement of the pending action.