**HAMILTON SECURITIES ADVISORY SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–169C.

United States Court of Federal Claims.

March 24, 2004.

Claude P. Goddard, Jr., Wickwire Gavin, P.C., Vienna, Virginia, for plaintiff.

Jeannine Lesperance and David J. Gottesman, United States Department of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BRADEN, Judge.

This case concerns two multi-million dollar contracts for financial advisory services that the Department of Housing and Urban Development ("HUD") attempted to amend in total disregard of the standard boilerplate requirements of the integration clause applicable to all federal contracts and the task order process. Accordingly, the court is compelled to begin its analysis by reminding HUD that: "The common law principle that a contract cannot be enforced if the terms are indefinite ... retains a core of vitality." *Goldstick v. ICM Realty*, 788 F.2d 456, 461 (7th Cir.1986). As Chief Judge Posner explained in that case:

> If people want the courts to enforce their contracts they have to take the time to fix the terms with reasonable definitiveness so that the courts are not put to an undue burden of figuring out what the parties would have agreed to had they completed their negotiations. The parties have the comparative advantage over the court in deciding on what terms a voluntary transaction is value-maximizing; that is the premise of a free-enterprise system.

This is not to say that enforcement should be denied if the parties by inadvertence failed to specify some peripheral term. Such omissions both are the unavoidable consequence of the limitations of human foresight and can be repaired by the courts without undue difficulty. But in this case essential terms were missing[.]

*Id.* at 461 (Posner, C. J.).

## RELEVANT FACTS [1]

### A. Mortgage Sales Program And Bid Instructions.

By September 1993, HUD held approximately $408 billion in multifamily and single family mortgage notes that it decided to sell through a series of sealed-bid auctions because the volume of HUD's mortgage portfolio had grown too large to manage effectively. *See Ervin,* 298 F.Supp.2d at 93.

Hamilton Securities Advisory Services, Inc. ("Hamilton"), a financial advisory firm with prior experience as a HUD contractor was selected to provide certain services regarding these auctions. HUD awarded Hamilton two contracts, DU100C000018161 ("the 18161 Contract") and DU100C000018505 ("the 18505 Contract"), pursuant to which Hamilton agreed to perform financial advisory support services for HUD related to the sale, refinancing, or auctions of HUD-held mortgages. *See* Jt. Stip. at ¶¶ 2–3. Both contracts were indefinite quantity; but services were procured by the

issuance of task orders. *See* Jt. Stip. at ¶ 4. The auctions involved in this case were named after the two major geographical regions where the properties were located, *e.g.,* the West of Mississippi Sale and the North/Central Sale. *Id.* at ¶ 5. HUD had "numerous goals in [the mortgage note sales] ... the most important of which was to maximize taxpayer return. Another significant goal was to continue to demonstrate to the marketplace that the [HUD] is a sophisticated player in the real estate mortgage industry. Finally, [HUD] wanted to ensure a fair and competitive auction that gave equal opportunity to large and small investors alike as well as borrowers." *See* Pl.App. at 33 (H/SM 008933); *Id.* at 38 (H/SM 012249).

### B. The 18161 Contract And Task Order 7—West Of Mississippi Sale.

Under the September 30, 1993 18161 Contract, Hamilton agreed to provide "Technical Services to Package HUD Owned Mortgages to Sell or Refinance Under Section 221(g)(4) of the National Housing Act." Gov't App. at 85. The 18161 Contract prominently displayed on the first page an integration clause that states:

The *rights and obligations of the parties* to this contract shall be subject to and *governed by the following documents:* (a) this award/contract; (b) the solicitation, if any, and (c) such provisions, representations, certification, and specifications, as are at-

---

1. The relevant facts cited herein were derived from findings made in *United States ex rel. Ervin and Associates, Inc. v. Hamilton Securities Group, Inc.,* 298 F.Supp.2d 91 (D.D.C.2004) *("Ervin")* (*Qui tam* action brought under False Claims Act, 31 U.S.C. § 3130, alleging that Hamilton and others were engaged in a variety of unlawful actions arising out of the same transactions at issue in this case); *Hamilton Securities Advisory Servs., Inc. v. United States,* No. 98–169 (Fed.Cl. Oct. 21, 2002) *("Hamilton I")*; and the following portions of the record in this case: March 9, 1998 Complaint ("Compl."); August 18, 1999 Government's Amended Counterclaim ("Gov't Counterclaim"); August 10, 1999 Joint Stipulation of Facts ("Jt.Stip."); Hamilton's October 1, 2003 Motion for Summary Judgment ("Pl. Oct. 1, 2003 Mot. S.J."); Hamilton's November 3, 2003 Motion for Summary Judgment on Government's Counterclaims ("Pl.Mot.S.J."); Hamilton's November 3, 2003 Appendix of Exhibits ("Pl.App."); December 9, 2003 Supplement to Plaintiff's Ap-

pendix of Exhibits ("Pl.Supp.App."); December 29, 2003 Second Supplement to Plaintiff's Appendix of Exhibits ("Pl. Second Supp.App."); Government's November 3, 2003 Cross–Motion for Summary Judgment on Counterclaims and Opposition to Hamilton's Motion for Summary Judgment ("Gov't Mot. S.J."); Government's November 3, 2003 and December 9, 2003 Appendices ("Gov't App."); Government's December 9, 2003 Opposition to Hamilton's Motion for Summary Judgment on Government's counterclaims ("Gov't Opp."); Hamilton's December 9, 2003 Opposition to Government's Motion for Summary Judgment on Counterclaims ("Pl. Opp."); Hamilton's December 9, 2003 Reply in Support of Summary Judgment; Government's December 22, 2003 Reply in Support of its Motion for Summary Judgment on Counterclaims ("Gov't Reply"); and Hamilton's December 29, 2003 Reply in Support of Summary Judgment on the Government's Counterclaims ("Pl.Reply").

tached or incorporated by reference herein.

*Id.* (emphasis added).

The 18161 Contract included a list to "illustrate the type of tasks that [Hamilton] *may* be asked to perform under this contract." *Id.* at 88 (emphasis added). Among such tasks was "Support for Section 221(g)(4) Project Mortgage Auction," which included:

[f]inancial advisory services ... to assist the Office of Housing with the sale of mortgages included in Section 221(g)(4) Project Mortgage Auctions .... [T]he auctions will determine if and at what yield the private sector is willing to purchase these 'puttable' instruments. *At the discretion of HUD,* the offeror [Hamilton] may perform all functions related to the auction. [Hamilton] shall provide, but not limited to, the following financial advisory services:

a. *Review and advise* on the operating procedures developed for the mortgage note auction;

b. *Review and advise* on the bid selection procedures;

c. *Advise* on the optimal timing, as it relates to market conditions, for the auction data;

d. *Participate* in the oversight of the auction process and *assist as needed;*

e. Prepare a pricing analysis for mortgages comparable to those in the auction *recommending* the maximum acceptable yield which HUD should accept in the auction.

f. *Advise* HUD on the evaluation of bids received in the auction;

g. Conduct a post review of the auction process and *advise* on potential modifications for future auctions.

*Id.* at 88 (emphasis added).

At a minimum, HUD stated a need for Hamilton to perform such tasks as the following:

a. *Recommend alternative methods for structuring project mortgage sales to maximize returns to HUD....*

f. Conduct all phases of any auctions with responsibility for the necessary personnel, equipment, services, and supplies[.]

*Id.* at 89. A similar listing of tasks to "Support Section 221(g)(4) Single–Family Mortgage Auctions" is found in Section 5 of the 18161 Contract. *Id.* at 91–92.

Sometime, in early 1995, Hamilton recommended to HUD and HUD approved that "bidders in future multifamily sales be given the option to set a 'floor' in their bids. This meant that a bidder could condition its bid on the bidder's being awarded a certain volume (the floor amount) of mortgages, or no mortgages would be awarded to it." Jt. Stip. at ¶ 13. Hamilton explained that "the idea was that bidders would place higher bids on a series of individual assets if the bidder had assurance that if they were successful with any bids, the winning bids would have to aggregate a certain volume (*i.e.,* the floor amount), or no assets would be awarded. In this way bidders would not be forced to take smaller amounts of assets than they desired." *Id.*

Hamilton then proceeded to prepare a "bid package" for the West of Mississippi Sale to allow bidders to designate "floors" in terms of the unpaid principal balance ("UPB"). *Id.* at ¶ 16. Neither the terms of the 18161 Contract nor Task Order 7, however, contain any language evidencing that HUD required Hamilton or that Hamilton agreed to utilize "bid floors" in awarding any of the auctioned properties.

On March 29, 1995, HUD issued Task Order 7 under the 18161 Contract, that listed the following "specific tasks" Hamilton was expected to perform concerning the West of Mississippi Sale:

● The Financial Advisor shall *oversee* the design of the due diligence process, according to the Design created for the Southeast non-performing sale.

● The Financial Advisor shall *recommend* alternative methods for structuring the mortgage sale and *pricing options to maximize loan sale proceeds to HUD.*

● The Financial Advisor shall prepare advertisements and other materials for the

pre-marketing of the loans to potential purchasers of multifamily mortgages.

- The Financial Advisor shall *design the auction process* and prepare auction announcements containing data on mortgages offered for sale and the loan sale structure. The package should explain the procedures for bidding and should contain the necessary documentation required of purchasers, including any representations and warranties that HUD will make to purchasers.

- Working with HUD and the contractor for legal counsel, the Financial Advisor shall review and oversee the design of the legal documents required, including the Loan Purchase Agreement.

- The Financial Advisor shall prepare copies of loan documents for the purchase by potential bidders, including the preparation of the bid packages and all necessary due diligence materials.

- The Financial Advisor *shall manage and implement* all phases of the bidding and auction process with responsibility for providing the necessary equipment, services, and supplies and managing the necessary personnel.

- The Financial Advisor will oversee the closing for the loan sales, including the contractor for legal counsel hired to handle such closings. It is anticipated that the contractor for due diligence and legal counsel will notify mortgagers and taxing authorities regarding the change in mortgage ownership and change in billing address with oversight from the Financial Advisor.

Gov't App. at 123 (Statement of Work-"Specific Tasks" Section) (emphasis added). Again, Task Order 7 obligated Hamilton *"to recommend* alternative methods for structuring the mortgage sale and pricing options to maximize loan sale proceeds to HUD." *Id.*

In addition, under Task Order 7, Hamilton was required to deliver to the GTR ("Government Technical Representative") a "detailed work plan" for approval:

The GTR shall have one week to approve the plan or to recommend revisions.

- 30 days after completing the work plan, the Financial Advisor should receive a due diligence protocol approved by the GTR, such protocol should be consistent with the design used for this process in the Southeast, non-performing loan sale.

- 30 days after signing the Task Order, the Financial Advisor will submit a brief report to the GTR, including an analysis of the portfolio and recommendations for structuring the loan sale. *The GTR shall have to* [sic] *two weeks to recommend revisions and approve the loan sale procedures.*

- 30 days after approval of the loan sale procedures, *the Financial Advisor shall submit a brief report recommending auction design and the data to be presented to investors* ("bidders package") and *submit a draft of the auction announcement; all of which must be approved by the GTR within two weeks.*

- 30 days after approval of the loan sale structure, the auction process and proposed bidders package, *the Financial Advisor shall submit a plan* for advertising and marketing the loan sale and shall develop a plan with the due diligence contractor for making available loan information and documentation to investors. *The GTR shall have one week in which to approve or revise the plan.*

- 15 days after the advertising and marketing plans have been approved, the Financial Advisor shall submit a report recommending the date and finalize the procedures and arrangements for handling the auction. *The GTR will have one week to approve or revise.*

- On the day of the auction, the Financial Advisor shall conduct all phases of the auction with responsibility for the necessary personnel, equipment, services and supplies.

- Following the auction, the Financial Advisor shall oversee the closing process managed by the contractor for legal counsel hired by HUD. Closings should be conducted in time constraints agreed upon with the GTR.

- On a weekly basis, the Financial Advisor shall provide status and progress reports

for the Contract. In addition, after auction or sale and again, after closing, *the Financial Advisor shall submit a brief report to the GTR, describing the conduct of the sale* and closing process and make recommendations for change in policies and procedures, if applicable, to enhance future loan sale performance for FHA.

Gov't App. at 124 (Statement of Work-"Deliverables" Section) (emphasis added). It is clear from this language that HUD's "detailed work plan" in all respects was closely scrutinized by and subject to the approval of the GTR. *Id.*

Under the March 29, 1995 Task Order 7 of the 18161 Contract, Hamilton was only required to *"recommend* alternative methods for structuring the mortgage sale and pricing options to maximize loan sale proceeds to HUD." *Id.* at 123 (emphasis added). Hamilton was not obligated to create an " 'Optimization Model' that was supposed to analyze all bids and select as winning bids the group of bids that would provide the maximum sales proceeds, while still meeting all applicable criteria, including but limited to the floors designated by bidders." Gov't Counterclaim at ¶ 8.

2. In determining whether to retain a mortgage or sell, HUD calculated a figure referred to as the "Credit Subsidy Value" or "Credit Reform Value," representing the "net present value of the estimated long term cost to the agency of the loans, exclusive of administrative expense." *See* Pl.App. at 19 (HUD/KK 000477). A positive credit subsidy indicated that "the loans would be more valuable to HUD if it continued to service them instead of sell[ing]." Pl.App. at 17 (HUD/KK 000129). The existence of a negative credit subsidy, however, indicated that the loans were more valuable if HUD were to sell them. *See* Pl.App. at 49 (311–12). The unpublished Credit Reform Value provided "a guideline for what HUD want[ed] to obtain from [any particular] sale." *See* Pl.App. at 16 (HUD/KK 000064). HUD did not establish a minimum bid, but "select properties have not been sold if the bid prices have come in much lower than HUD expected." *Id.*

3. HUD conducted the auctions in accordance with the rules set forth in the Bid Instructions and the Loan Sale Agreement set forth in the "Bidder's Information Package." *See* Pl.App. at 42–44 (H/SM 14944–015093, H/SM 015095–015268, H/SM 013611–013904). HUD reserved the right, subject to its discretion, to accept or

Sometime after August 1995, Hamilton prepared the bid package for the West of Mississippi Sale that permitted "bidders to designate 'floors,' expressed in terms of the UPB of mortgages bid upon" so that a bidder could condition its bid on being awarded a certain volume (the floor amount) of mortgages or no mortgages would be awarded to it. Jt. Stip. at ¶ 16. The West of Mississippi Sale included 158 mortgage loans with a total UPB of $622.3 million. *See* Pl.App. 33 at H/SM 008932.[2]

Hamilton retained the services of Bell Laboratories/Lucent Technologies, Inc. ("Lucent") and "instructed Lucent to use an optimization model that treated bidders' floors, referring to the amount of revenue of the bids (*i.e.,* the price offered by bidders)." Jt. Stip. at ¶ 18. On or about September 18–19, 1995, bids were submitted in the West of Mississippi Sale, but only some included floors referring to the UPB of the mortgages bid on. *Id.* at ¶ 19.[3] On September 20, 1995, a Hamilton employee, working with a Lucent employee, discovered a discrepancy in the instructions to Lucent regarding the "floor." *See Ervin,* 298 F.Supp.2d at 98. The Lucent employee informed the Hamilton employee that he could use a pro-rata methodology

reject any bids and to waive any "technical or formal defect relating to ... any bid." *See, e.g., id.* at 42 (H/SM 014962). HUD also reserved the right to "evaluate bids ... in a manner that optimizes the gross proceeds to HUD from the sale of the Mortgage Loans, *collectively,* rather than from the sale of any specific pool of Mortgage Loans." *See, e.g., id.* at 42 (H/SM 015013) (emphasis added). The Federal Housing Administration ("FHA") Commissioner made the final determination in awarding the winning bids. *See id.* at 17 (HUD/KK 000128).

Bidders submitted written, binding offers that were irrevocable as of the time and date of the sale. *See* Gov't App. at 226, 335. The Loan Sale Agreement, signed by an authorized officer of the bidder, became mutually binding when a HUD official signed it. *See, e.g., id.* at 205. Bidders also were required to submit an initial deposit of 5% of the bid amount and submit an additional 5% deposit, if their bids were accepted by HUD. *See, e.g., id.* at 226–27. Under the Loan Sale Agreement, if a winning bidder failed to close, then the entire deposit was subject to forfeiture as liquidated damages. *See, e.g., id.* at 227. A bidder's failure to close on the purchase of any mortgage note was also a default on any other bids that had been accepted. *See, e.g., id.* at 476.

that would approximate the amount of revenue that would potentially be generated under the UPB-based floor. *Id.* at 96. The Hamilton employee instructed the Lucent employee to use the pro-rated methodology. *Id.; see also* Jt. Stip. at ¶ 20. Thus, rather than reporting the situation to HUD, Hamilton authorized the use of a "proration methodology" in running the optimization model. Jt. Stip. at ¶¶ 21–23. On or about September 21–22, 1995, Hamilton provided the results to HUD. *Id.* at ¶¶ 22–28. HUD proceeded to award the mortgages offered under the West of Mississippi Sale, without knowledge of any of the aforesaid problems. *Id.* at ¶¶ 25–26.

Under Task Order 7, Hamilton performed work during March–October, 1995 and was paid a fixed amount of $1,765,631 for its services. *See* Jt. Stip. at ¶¶ 7–9, 28. HUD received $385.2 million in bids on the West of Mississippi Sale. *Id.* at ¶ 29.[4] Hamilton does not contest that the utilization of "bid floors" in running an optimization model in the West of Mississippi Sale would have generated an additional $2,372,207. *Id.* at ¶ 55.

## C. The 18505 Contract and Task Order 1——North/Central Sale.

Under the January 24, 1996 18505 Contract, Hamilton agreed to provide HUD with "Financial Advisory Services" regarding the "Sale of HUD–Held Project Mortgages and Auctioning Sect. 221(g)(4) Mortgages." Gov't App. at 128, 132. The 18505 Contract also contains an integration clause that states:

> The *rights and obligations of the parties* to this contract shall be subject to and *governed by the following documents:* (a) this award/contract; (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications as are attached or incorporated by reference herein.

*Id.* at 128 (emphasis added).

The 18505 Contract also contains no reference to whatever separate agreement be-

tween Hamilton and HUD may have had regarding "bid floors." Hamilton was advised, however, at a minimum, that it:

> *may* [be required to] perform such tasks as the following:
>
> a. *Recommend alternative methods for structuring project mortgage sales to maximize returns to HUD.*
>
> b. Price and assemble packages of mortgages for sale.
>
> c. Prepare policy analyses and reports in connection with mortgage sales program.
>
> d. Prepare credit subsidy estimates likely to be generated by mortgage sales for use in budget and deal with OMB on HUD's behalf on credit subsidy issues.
>
> e. Prepare Project Mortgage Auction Announcements, brochures, and summaries containing procedures for the auction and a list of mortgages offered for sale for distribution to potential bidders.
>
> f. Prepare and place advertisements for the mortgage sale in suitable publications.
>
> g. Conduct all phases of any auctions with responsibility for the necessary personnel, equipment, services, and supplies.
>
> h. Coordinate with HUD and HUD's legal staff or legal services contractors to complete project mortgage sales closing.
>
> i. Prepare materials and assist in briefings and presentations on mortgage sales.

*Id.* at 132–33 (emphasis added).

The 18505 Contract also covered "Refinancing and Restructuring of HUD–Held and Insured Project Mortgages & HUD–Owned Projects," under which Hamilton:

> *shall assist* with such tasks as the following:

---

4. HUD realized actual revenue only if it the sales closed. *See* Pl.App. 49 at 162–67. During the course of all of HUD's mortgage sales, over 5 percent of the bidders failed to close on HUD's mortgage sales over time. *Id.* at 183. HUD collected only $368 million on the West of Mississippi Sale instead of $385.2 million because three sales failed to close. *Id.* at 23 (HC–18161,-T.O.7); *Id.* at 33 (H/SM 008947). The amount of profit that HUD could realize on any sale varied if the value of the mortgages changed before closings but after the bidding. *Id.* at 50 (167–72).

a. Assess feasibility of refinancing unsubsidized mortgages with insured or conventional financing.

b. Assess feasibility of refinancing subsidized mortgages through State Housing Finance agencies as well as other means.

c. Assess feasibility of refinancing delinquent mortgages by recasting mortgage and lowering debt service to bring mortgages current.

d. Apply HUD underwriting standards for project income and expenses and physical condition to assess feasibility of refinancing.

e. Assess methods for lowering transaction costs and encouraging mortgagors to refinance, even at the same interest rate, including cost-effectiveness of HUD purchase of a blanket commitment of refinancing funds.

f. Recommend any modifications to current HUD or GNMA rule or procedures needed to facilitate refinancing, including the development of simplified refinancing procedures and treatment of any Section 8 savings.

g. Coordinate with HUD legal staff or legal services contractors to assess applicability of Title VI of National Affordable Housing Act of 1990 and other relevant statutes and policies to mortgage refinancings.

h. Assess individual proposals for refinancing which are unique or differ significantly from current HUD policy guidelines, analyze their value to HUD, and make recommendations, as appropriate, for revision of HUD policies and procedures.

i. Assist HUD with subsidy layering reviews, including monitoring State Housing Finance agency review performance, as appropriate.

j. Provide technical assistance on the restructuring of HUD-held or insured project mortgages, including assessing workout proposals, mortgage modifications, bond refinancings, and partial payments of mortgage insurance claims proposed by owners.

*Id.* at 133–34 (emphasis added).

In addition, the 18505 Contract provided that Hamilton:

*may* also be required to provide further technical assistance [regarding "other Housing Finance Tasks"] to:

a. Provide technical advice on the sale of individual projects, including sales to residents.

b. Locate sources of financing for individual projects or types of projects.

c. Assess availability of other potential subsidies and incentives for HUD-held and insured project sales, including sources of credit enhancement.

[Missing "d" in original]

e. Provide technical assistance on non-insured Section 8 bond refundings.

f. Undertake other related activities.

g. Represent HUD in meeting with other agencies on Housing Finance issues.

h. Advise FHA on ways and means of increasing investment by pension funds in affordable Housing.

i. Advise FHA on sale of partially subsidized mortgages.

j. Assist FHA with negotiated sales of subsidized mortgages to State Housing Finance agencies and other public agencies.

k. Determine, evaluate, and recommend implementation strategies, policies, and procedures for improved management of the HUD–Held multifamily, single family, Title I, and other portfolios of notes and insurance premium income streams, including improvements in cash flows, workouts, servicing and disposition.

l. *Design strategic frameworks for disposition that will:*

i. *maximize sales proceeds*

ii. eliminate/reduce future recourse to FHA

iii. ensure tenants are not unnecessarily displaced

iv. minimize Department staff time/workload

v. expand universe of potential investors

vi. ensure housing stock and neighborhood preservation

vii. maximize competition and fairness of process.

*Id.* at 134–35 (emphasis added).

Regarding the Sale of HUD–Held Single Family Mortgages, Hamilton also was advised, at a minimum, that it:

*may perform* such tasks as the following:

a. Recommend alternative methods for structuring single family mortgage sales to maximize returns to HUD.

b. Prepare Single Family Mortgage Auction Announcements containing procedures for the auction and a list of mortgages offered for sale for distribution to potential bidders.

c. Conduct all phases of any auctions with responsibility for the necessary personnel, equipment, services, and supplies.

d. Perform project mortgage sales closings.

e. Coordinate with HUD staff and legal services contractors to prepare documents necessary to effect the assignment of the mortgage notes to the purchaser.

f. Determine the prospective amount of credit subsidy in the sale, in accordance with the Office of Management and Budget (OMB) Circular A–34, and deal with OMB on HUD's behalf on this credit subsidy issue.

*Id.* at 135–36 (emphasis added).

To facilitate the Sale of HUD–Held Title I Notes and Section 530 Insurance Premiums, Hamilton further was advised, at a minimum, that it:

*may perform* such tasks as the following:

a. *Recommend alternative methods for structuring sales to maximize returns to HUD.*

b. Prepare Auction Announcements containing procedures for the auction and a[sic] lists of notes, mortgages, and cash flows offered for sale for distribution to potential bidders.

c. Conduct all phases of any auctions with responsibility for the necessary personnel, equipment, services, and supplies.

d. Coordinate with HUD staff and legal services contractors to perform sales closings and prepare and/or execute documents required to effect the assignment of the notes or interests to the purchaser.

e. Determine the prospective amount of credit subsidy in the sale, in accordance with the Office of Management and Budget (OMB) Circular A–34, and deal with OMB on HUD's behalf on this credit subsidy issue.

*Id.* at 136 (emphasis added).

On February 23, 1996, Hamilton presented HUD with a Technical Proposal for Cross–Cutting Financial Advisory Services. *See* Gov't App. 928–38; *see also id.* at 929 (indicating that Hamilton was responding to a request from HUD, but that is not in the record). Again, there is not one word in this document that mentions an optimization model or any requirement concerning "bid floors," even though it appears that Hamilton and HUD had a discussion in early 1995 and came to some agreement to allow bidders to "set a 'floor' in their bids." Jt. Stip. at ¶¶ 13–15.

On April 25, 1996, HUD issued Task Order 1 for "Financing Advisory (FA) services to support portfolio restructuring and asset sales crosscutting." *See* Gov't App. at 184; Jt. Stip. at ¶ 30.[5] HUD's "objective" in issuing Task Order 1 was "to restructure its portfolios of insured mortgages and to sell its portfolios of multi-family and single family HUD-held mortgages and HUD-owned properties while maximizing the proceeds of those sales." Jt. Stip. at ¶ 34. Eleven specific "tasks" were identified for the contractor:

---

**5.** HUD describes "crosscutting" in the following context: "Although loan sales and the portfolio restructuring of the insured portfolio will be discrete transactions, there are several issues and services that will cut across transactions and many Departmental disciplines and are best handled on a coordinated basis by one entity." Gov't App. at 187 (Statement of Work-"Background" Section).

Credit Reform; Overall Program Management; Asset Sales Design; Due Diligence; Marketing the Transaction; Bid Date Review, Sales Approval, and Post Auction Review; Post Closing Support; Data Review and Website Maintenance; Budget and Budget Planning; Business Process Reengineering; and Staff Development. *See* Gov't App. at 188–93 (Statement of Work-"Specific Tasks" Section); Jt. Stip. at ¶ 36. The Asset Sales Design and Bid Date Review, Sale Approval and Post Auction Review tasks specifically require the use of an "optimization model." [6]

The Asset Sales Design "task" provides: "As *directed by HUD*, [Hamilton] shall: ... *Provide and run an optimization model for whole loan auctions.* In contrast to other sales interaction between the financial advisor on the sale and the Cross Cutting Advisor, this *activity has the Crosscutting Advisor [Hamilton] in the role of performing the task, rather than reviewing the design or results of the sales financial advisor.*" *See* Gov't App. at 190, ¶ 3.2; Jt. Stip. at ¶ 37 (emphasis added).

The Bid Date Review, Sale Approval and Post Auction Review, "tasks" provide:

*As directed* by HUD, [Hamilton] shall:

6.1) Review plans for receiving bids for the sale of loans, monitoring deposits, addressing non-conforming bids, and delivering conforming bids to the '*optimizational model*' to ensure consistency with HUD's sale procedures; offer recommendations.

6.2) *Run the optimization model in accordance with the design approved by HUD;* deliver results to transaction financial advisor.

6.3) Participate in the post-bid meeting with HUD decision makers and offer insights regarding consistency with stated objectives.

6.4) Review Post–Auction Review to be completed by the financial advisor and participate in HUD review meeting; offer insights as necessary.

6.5) Provide summary reports to financial advisors and HUD on the optimization results.

Gov't App. at 191 (emphasis added); *see also id.* at 195 (requiring "a written study of the *optimization analyses* for each sale within 5 days of the sale approval by HUD.") (emphasis added). Again, this task required Hamilton to run an "optimization model," the design, however, was to be determined by HUD.

The North/Central Sale included 156 mortgage loans with a total UPB of $847.2 million. *See* Pl.App. at 38 at (H/SM 012249). The bidders participating in the North/Central Sale also were permitted to designate "floors" in terms of the UPB mortgages. *See* Jt. Stip. at ¶ 40. On or about August 5–6, 1996, bids were submitted in the North/Central Sale. *Id.* at ¶ 44. Lucent ran the optimization model during the period August 5–8, 1996, again based on Hamilton's instructions to treat the "floors" as referring to the amount of revenue on the bids, rather than UPB. *Id.* at ¶¶ 43–45. The results were reported to Hamilton no later than August 8, 1996, which in turn advised HUD's financial advisor. *Id.* at ¶ 46. Shortly thereafter, HUD awarded the mortgages based on the bid results without knowledge of the situation regarding the optimization model. *Id.* at ¶¶ 47–48.

Hamilton performed work under Task Order 1 for the period of July 26–August 25, 1996 and was paid a fixed monthly fee of $868,417 under the 18505 Contract, for the North/Central Sale. *See* Jt. Stip. at ¶¶ 33, 42, 49. HUD received $621,674,221 from the North/Central Sale. *Id.* at ¶ 50.[7] Hamilton

---

**6.** "Optimization model" is not defined in the 18505 Contract nor Task Order 1. One definition of "model" is "to produce a representation or simulation <using a computer to [model] a problem>." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 746 (10th ed.2001). "Optimization" is defined as "an act, process, or methodology of making something (as a design, system, or decision) as fully perfect, functional, or effective as possible." *Id.* at 815.

The parties in this case have stipulated that the "optimization model was a computer model that was to evaluate the optimum combination of bids for HUD to accept in any particular auction of HUD-held mortgages." Jt. Stip. at ¶ 17.

**7.** All of the winning bidders in the North/Central Sale closed. *See* Gov't App. at 829.

does not contest that use of a correct optimization model in the North/Central Sale would have generated an additional $1,511,244 in proceeds. *Id.* at ¶ 55.

### D. Hamilton's Disclosure Regarding The Optimization Model And HUD's Response.

The parties stipulated that in late October 1996, Hamilton claimed it "realized that there *might* have been a discrepancy in the way the bid floor was calculated in the West of the Mississippi and North/Central Sales." Jt. Stip. at ¶ 51 (emphasis added). This statement directly conflicts with another stipulation that asserts "one of [Hamilton's] employees discovered the discrepancy in the instructions to Lucent ... on September 20, 1995." *Id.* at ¶ 21. It is clear, however, that Hamilton provided HUD with two reports about the optimization model situation in December 1996, *id.* at ¶¶ 53, 56, some time after "Hamilton took corrective action." *Id.* at ¶ 56.

In early 1997, FHA Commissioner and FHA Comptroller met with HUD's Acting General Counsel to discuss Hamilton's reports, but no action was taken until October 1997. *Id.* at ¶¶ 56–58. The relevant HUD contracting officer ("CO") issued a claim in October 1997 against Hamilton and promptly terminated the 18505 Contract for convenience. *See* Gov't App. at 926; *see also Hamilton I*, at 6. In addition, HUD withheld the final two payments under the 18505 Contract, in the amount of $1,505,256. *See Hamilton I*, at 6–7. The 18161 Contract expired by its terms on September 30, 1998. *Id.* at 5.

### PROCEDURAL HISTORY

On December 10, 1997, Hamilton submitted a certified claim in the amount of $1,505,256 plus interest to the CO. *See* Compl. at ¶ 12 (referencing Exhibit 5 attached thereto). The CO did not respond to Hamilton's certified claim. *Id.* at ¶ 13. On March 9, 1998, Hamilton filed a complaint for breach of contract in the United States Court of Federal Claims for payment of $1,505,256 regarding two invoices that it submitted to HUD under Task Order 1 of the 18505 Contract, prior to HUD's termination for conven-

ience on October 17, 1997. On June 12, 1998, the Department of Justice ("Government") filed a motion to dismiss for lack of subject matter jurisdiction that was denied on April 27, 1999 by the Honorable Marian Blank Horn. *See Hamilton Securities Advisory Servs., Inc. v. United States*, 43 Fed.Cl. 566 (1999).

On May 27, 1999, the Government filed an answer and counterclaim. On August 10, 1999, both parties entered into a "Joint Stipulation of Facts." *See* Jt. Stip. at 1. On August 18, 1999, the Government amended the counterclaim to include both breach of contract and negligent misrepresentation claims. *See* Gov't Counterclaim.

On October 1, 1999, Hamilton filed a motion *in limine* to limit the Government's potential recovery under the 18505 Contract and Task Order 1 only to an adjustment on the purchase price under an "Inspection of Services" clause. On March 15, 2000, Judge Horn denied Hamilton's motion regarding the Government's breach of contract claim and dismissed the negligent misrepresentation claim. *See Hamilton Securities Advisory Services, Inc. v. United States*, 46 Fed.Cl. 164 (2000). On May 24, 2000, Judge Horn recused herself and vacated the March 15, 2000 opinion and order. *See Hamilton Securities Advisory Services, Inc. v. United States*, 46 Fed.Cl. 718 (2000).

On May 24, 2000, this case was reassigned to the Honorable Lynn J. Bush. On October 21, 2002, Judge Bush entered an unpublished opinion and order denying Hamilton's motion *in limine* determining that the "Inspection of Services" clause did not preclude the Government's breach of contract claim since it was inapplicable to the circumstances and dismissed the negligent misrepresentation claim. *See Hamilton I*, at 16, 29. Hamilton's motion to reconsider was denied on January 23, 2003.

On October 1, 2003, Hamilton moved for summary judgment "in the form of a declaration that HUD is contractually obligated [under the 18505 Contract and Task Order 1] to Hamilton in the amount of $1,505,256 (plus applicable interest as provided by law) for work Hamilton performed from August 26,

1997 through October 17, 1997." Pl. Oct. 1, 2003 Mot. S.J. at 7–8. In addition, Hamilton filed proposed findings of uncontroverted fact on that date. On November 3, 2003, the Government filed an opposition to Hamilton's motion for summary judgment, as well as a cross-motion for summary judgment regarding the breach of contract counterclaim as to both the 18161 Contract and 18505 Contract. *See* Nov. 3, 2003 Gov't Mot. S.J.; *see also* Gov't Counterclaim at ¶ 24. In addition, on November 3, 2003, the Government filed proposed findings of uncontroverted fact and a response to plaintiff's proposed findings of uncontroverted facts. On December 9, 2003, Hamilton filed a reply to the Government's opposition to Hamilton's motion for summary judgment, together with a response to HUD's Motion for Summary Judgment as to its counterclaim. *See* Pl. Opp.

On November 3, 2003, Hamilton also moved for summary judgment on the Government's August 18, 1999 counterclaim. *See* Pl. Mot. S.J. On that date, Hamilton also filed a statement of facts on which it claimed there is no genuine dispute regarding the Government's counterclaim. On December 9, 2003, the Government filed an opposition to Hamilton's motion for summary judgment on HUD's counterclaim and a response to Hamilton's motion for summary judgment on the Government's counterclaim. *See* Gov't. Opp.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1) to render judgment and money damages on any claim against the United States founded on the United States Constitution, any act of Congress, regulation of an executive department, or on an express or implied in fact contract with the United States. *See United States v. Testan*, 424 U.S. 392, 397–398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Therefore, to maintain

standing in this court, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and or executive agency regulation that provides a substantive right to money damages. *See Khan v. United States*, 201 F.3d 1375, 1377 (Fed.Cir.2000). In this case, plaintiff properly has plead a claim for breach of contract. *See* Compl. at ¶¶ 22–25. Likewise, the Government properly has plead a counterclaim for breach of contract. *See* Gov't Counterclaim at ¶¶ 1–26.

Under the Contract Disputes Act ("CDA"), the United States Court of Federal Claims also has jurisdiction to grant non-monetary relief in limited circumstances. *See* 28 U.S.C. § 1491(a)(2). As a matter of law, the 18161 Contract and Task Order 7 thereunder and the 18505 Contract and Task Order 1 thereunder are governed by the CDA. *See* Gov't App. at 85–200. As a necessary jurisdictional predicate, the CO is required to issue a final decision. *See* 41 U.S.C. § 605. In this case, Hamilton timely filed a claim with the CO, but the CO declined to exercise jurisdiction to make findings. *See* Compl. at ¶¶ 12, 13. Nevertheless, the court now properly has jurisdiction because "[a]ny failure by the [CO] to issue a decision on a contract claim within the period required will be deemed to be a decision by the [CO] denying the claim and will authorize the commencement of . . . suit on the claim as otherwise provided in this chapter." 41 U.S.C. § 605(c)(5).

In addition, the court properly has jurisdiction over a counterclaim based on restitution. *See* 28 U.S.C. §§ 1503, 2508; *see also Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946) (holding that the predecessor to 28 U.S.C. § 1503 was "to permit the government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the government and a claimant against it."); *Barrett Ref. Corp. v. United States*, 242 F.3d 1055, 1063 (Fed.Cir. 2001).

### B. Standard Of Review For Summary Judgment.

If there is no genuine issue as to any material fact, the moving party is entitled to

summary judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of"*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding the movant must meet its burden "by 'showing'—that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). The moving party may need only to support its motion with "solely ... the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324, 106 S.Ct. 2548; *see also Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed.Cir. 2002). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63.

The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In addition, all presumptions and reasonable inferences must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995); *Jay v. Secretary of Dept. of Health and Human Servs.*, 998 F.2d 979 (Fed.Cir.1993).

The fact that both parties in this case have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *Id.* (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). The court must evaluate each party's motion on its own merits. *Id.*

**C. Resolution Of Pending Motions.**

**1. Hamilton's Motion For A Declaratory Judgment Regarding The 18505 Contract And Task Order 1 Is Denied.**

On October 1, 2003, Hamilton moved for a declaratory judgment that HUD is contractually obligated to Hamilton in the amount of $1,505,256, plus applicable interest, regarding the 18505 Contract. *See* Pl. Oct. 1, 2003 Mot. S.J. at 2. Both parties have stipulated, pursuant to the 18505 Contract, that: 1) Hamilton performed certain services between August 26, 1997 and October 17, 1997; 2) Hamilton submitted an invoice to HUD on September 26, 1997 in the amount of $868,417 for work performed from August 26, 1997 through September 25, 1997, which HUD refused to pay; 3) on October 23, 1997, Hamilton submitted an invoice to HUD in the pro-rated amount of $636,839 for work performed from September 26, 1997 through October 17,

1997, which HUD also refused to pay; and 4) Hamilton submitted a certified claim to the CO on December 10, 1997 in the amount of $1,505,256, plus interest. *See* Jt. Stip. at ¶¶ 57–64. In addition, the parties have stipulated that HUD has acknowledged that "were it not for whatever right HUD has to withhold funds for setoff or recoupment based upon HUD's claims against Hamilton, $1,505,256 would otherwise be due Hamilton up through the date of termination of the 18505 Contract." *Id.* at ¶ 65.

In 1992, the Tucker Act was amended to clarify that the United States Court of Federal Claims jurisdiction extended "judgment upon any claim by or against ... a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including ... other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA]." 28 U.S.C. § 1491(a)(2). In *Garrett v. General Elec. Co.*, 987 F.2d 747 (Fed.Cir.1993), the United States Court of Appeals for the Federal Circuit held that this amendment provided the United States Court of Federal Claims with jurisdiction over a "nonmonetary substitute for monetary relief[.]" *Id.* at 750–51; *see also Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1270 (Fed.Cir. 1999) ("[T]he *Garrett* case stands for the proposition that nonmonetary claims are not outside the jurisdiction of the Court of Federal Claims[.]"). Therefore, the court has jurisdiction to grant Hamilton's motion for summary judgment requesting an interpretation of the 18505 Contract. The court in this case, however, declines to exercise that jurisdiction.

 As the United States Court of Appeals for the Federal Circuit has recognized, the court is not "required to issue a declaration of rights whenever a government contractor raises a question of contract interpretation during the course of contract performance.... the court ... is free to consider the appropriateness of declaratory relief, including whether the claim involved a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Alliant Techsystems*, 178 F.3d at 1271. In this case, performance under the 18505 Contract has been completed and a trial is scheduled to commence on April 14, 2004, so there is no "special need for early resolution of a legal issue." *Id.* In addition, HUD's pending counterclaim involves a "live dispute between the parties" that a declaration will not resolve. *Id.* Moreover, Hamilton's complaint seeks damages for HUD's alleged breach of contract, for which "legal remedies [are] available ... adequate to protect the parties' interests." *Id.* In addition, as a matter of law, the Government has the right to a setoff, absent an explicit statutory or contractual provision to the contrary. *See, e.g., Johnson v. All–State Const., Inc.*, 329 F.3d 848, 852 (Fed.Cir.2003); *Applied Companies v. United States*, 144 F.3d 1470, 1475 (Fed.Cir.1998).

Accordingly, Hamilton's motion for summary judgment for a declaratory judgment regarding the 18505 Contract is denied because the court has determined that the interest of justice is best served by resolution of Hamilton's claim and HUD's counterclaims in one final judgment.

**2. The Government's Cross–Motion For Summary Judgment Regarding Breach Of The 18161 Contract And 18505 Contract Is Denied.**

 The Government's August 18, 1999 counterclaim for breach of contract estimates a loss of at least $3,883,551, which it alleges was caused by Hamilton's "error" in "misapplying the floors." Gov't Counterclaim at ¶ 13. On November 3, 2003, the Government filed a cross motion for summary judgment as to its breach of contract counterclaims in the amount of $4,141,065. *See* Gov't Mot. S.J. at 33.

The parties have stipulated to the fact of their contractual relationship. *See* Jt. Stip. at ¶¶ 2–5. "Under [the 18161 and 18505 Contracts] Hamilton was to provide, among other things, financial advisory support services necessary to sell or re-finance HUD-held mortgages, and to conduct auction sales of groups of HUD-held mortgages." *Id.* at ¶ 3. The Government points out that Judge

Bush entered an opinion and order determining that damages were "foreseeable" since "Hamilton and the government expected that the government would receive the maximum proceeds through the proper selection of running bids from auctions conducted within specific parameters." *Hamilton I*, at 23. Judge Bush also determined that Hamilton's error in providing Lucent with incorrect instructions "directly led to the shortfall in auction proceeds for which the government is requesting an award of consequential damages." *Id.* at 24. A necessary predicate to determining whether a breach of either the 18161 and 18505 Contracts, or Task Orders issued thereunder, occurred and the proper remedy requires the court now to examine the relevant contracts to which HUD and Hamilton were parties and the parties' motions for summary judgment concerning these contracts.

**a. Neither The 18161 Contract Nor Task Order 7 Required Hamilton To Design Or Run An Optimization Model Utilizing "Bid Floors" To Yield HUD "Maximum Proceeds" On The West Of Mississippi Sale.**

The 18161 Contract, dated September 30, 1993, provides that the "objective of this procurement is to assist [HUD] in securing the technical services needed to sell or refinance HUD-held mortgages and to auction Section 221(g)(4) mortgages in a *manner that is cost-effective* to the Federal Government." Gov't App. at 87 (emphasis added). The 18161 Contract contains a standard integration clause that provides:

> The *rights and obligations of the parties* to this contract shall be subject to and *governed by the following documents:* (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, *as are attached* or *incorporated by reference herein.*

*Id.* at 85 (emphasis added). Therefore, as a matter of law, the terms of the 18161 Contract must be construed based on the language found in the governing documents, not parol evidence. *See McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir. 1996) (holding that where there is a "strong

presumption that the contract was … [a] fully integrated agreement, coupled with the consistency of the evidence surrounding its execution with that presumption … the agreement was fully integrated."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. e (1981) ("RESTATEMENT") (the existence of integration clause is "likely to conclude the issue whether the agreement is completely integrated."). Thus, the court is required to interpret the contract by its "plain language." *McAbee Const.*, 97 F.3d at 1435; *see also Scott Timber Co. v. United States*, 333 F.3d 1358, 1366 (Fed.Cir.2003) ("the court accords the contract terms their customary and accepted meaning").

The court, however, has found no language in the 18161 Contract nor Task Order 7 that obligated Hamilton to provide any services regarding an "optimization model," or the utilization of any "bid floors," or to provide any services that would yield any specified level of proceeds from auctions, much less "maximum sales proceeds, while still meeting all criteria, including but not limited to the floors designated by bidders." *Compare* Gov't App. at 85–126 *with* Gov't Counterclaim at ¶¶ 5–8. Moreover, none of the six Amendment(s) of Solicitation/Modification of Contract required Hamilton to provide any services to HUD regarding an "optimization model," nor was Hamilton required to guarantee HUD any minimum return from the auction sales. *See* Gov't App. at 111–19. To be sure, Hamilton was advised that HUD *may* request Hamilton to "*[r]eview and advise on the operating procedures developed for the mortgage note auction,*" "review and advise on the bid select procedures" and prepare a "*pricing analysis* for mortgages comparable to those in the auction recommending the maximum acceptable yield which HUD should accept in the auction." *Id.* at 88 (emphasis added). But, as the 18161 Contract plainly states, "the auctions will determine *if and at what yield* the private sector is willing to purchase these 'puttable instruments.'" *Id.* at 88, 91 (emphasis added).

Therefore, to the extent that Hamilton used an optimization model to determine the winning bids on the West of Mississippi Sale

and there was an error in the instructions that Hamilton provided to Lucent so that the "bid floors" were treated as revenue, rather than as unpaid principal balance, any obligation Hamilton may have assumed in this regard arose outside the parameters of the 18161 Contract or Task Order 7. Accordingly, the Government's Cross–Motion for Summary Judgment regarding breach of the 18161 Contract or Task Order 7 is denied.

### b. Neither The 18505 Contract Nor Task Order 1 Required Hamilton To Run An Optimization Model Utilizing "Bid Floors" To Yield HUD "Maximum Sales Proceeds" On The North/Central Sale.

Under the January 24, 1996 18505 Contract, Hamilton agreed that it may be required to "[r]ecommend alternative methods for structuring project mortgage sales to maximize returns to HUD." Gov't App. at 132, 136 (emphasis added). In addition, Hamilton was aware that it may be required to "[d]esign strategic framework that will maximize sales proceeds." *Id.* at 135 (emphasis added). But this language falls short of an affirmative promise to create an "'Optimization Model' that was supposed to analyze all bids and select as winning bids the group of bids that would provide the maximum sales proceeds[.]" Gov't Counterclaim ¶ 8. In fact, the 18505 Contract does not even use the term "optimization model" or provide a definition, nor is there any language obligating Hamilton to utilize "bid floors." The April 25, 1996 Task Order 1, however, does evidence Hamilton's obligation to *"[p]rovide and to run* an optimization model," but HUD (or its designated financial advisor) was responsible for reviewing the Asset Sales design. *See* Gov't App. at 190 (the activity to provide and run an optimization model has Hamilton "in the role of performing the task, rather than reviewing the design or results.") (emphasis added). Task Order 1, however, does not contain any language that obligated Hamilton to utilize "bid floors" or "provide the maximum sales proceeds, while still meeting all criteria, including but not limited to the floors designated by the bidders." Gov't Counterclaim at ¶ 8.

The integration clause in the 18505 Contract makes it clear that Hamilton's obligations are limited only to the language therein and "such . . . specifications as are attached or incorporated by reference herein." *See* Gov't App. at 128. Whatever design HUD approved was not attached or specifically identified in either the 18505 Contract or Task Order 1. Therefore, whatever obligations Hamilton assumed with regard to that design are not subject to Contract 18505 or Task Order 1.

The United States Court of Appeals for the Federal Circuit has advised that the "requirement of certainty in contracts serves two purposes. One is the need to determine whether the parties in fact intended to contract at all, and the other relates to the ability of a court to determine when a breach has occurred and to formulate any appropriate remedy." *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed.Cir.1991) (citing RESTATEMENT § 33)("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.") and *Neeley v. Bankers Trust Co.*, 757 F.2d 621 (5th Cir.1985), wherein the United States Court of the Fifth Circuit held that:

> the entire contract falls with the failure of indefinite promises. . . . Like most questions of contract law, whether a promise or other term forms an essential part of an agreement depends primarily upon the intent of the parties. Thus, an *"essential" promise denotes one that the parties reasonably regarded, at the time of contracting,* as a vitally important ingredient in their bargain. Failure to fulfill such a promise, in other words, would seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole. *Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential precisely because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained.*

*Id.* at 628 (emphasis added); *see also Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1332 (Fed.Cir.2000); *Modern Sys. Tech. Corp. v. United States,* 979 F.2d 200, 202 (Fed.Cir.1992); *Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593 (2nd Cir.1978) (holding that "a court cannot decree performance of an agreement unless it can discern with reasonable certainty and particularity what the terms of the agreement are. *To consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner that is susceptible of judicial interpretation.*") (emphasis added).

HUD had ample opportunity in issuing Task Order 1 specifically to state what it expected of Hamilton regarding the "bid floors" and to satisfy the requirements of the integration clause. HUD declined to exercise that opportunity and must live with the consequences. *See LaSociete Generale Immobiliere v. Minneapolis Comm. Dev. Agency,* 44 F.3d 629, 637 (8th Cir.1994), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 22 (1995) (when "two sophisticated parties negotiated a commercial contract which was executed in the absence of fraud, duress, or any other form of unconscionability, [the court] will not rewrite the contract to save a contracting party from its own poor decisions."); *see also Brookhaven,* 583 F.2d at 593 ("If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result.").

The court is mindful that our appellate court has cautioned that "once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract." *Aviation Contractor,* 945 F.2d at 1572 (citing 1A CORBIN, CORBIN CONTRACTS § 97 (1963)). And, it appears that the parties had some understanding regarding utilization of "bid floors" in running the optimization model, but the standard integration clause also included the 18505 Contract specifically proscribes any amendment thereto or assumption of obligations, by either party, without strict compliance with its terms. *See* Gov't App. at 85, 128; *see also Baltimore & O.R.R. v. United States,* 261 U.S. 592, 596–97, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923) (a government official cannot commit to an implied-in-fact contract, which *ipso facto* is beyond the scope of his authority). For these reasons, the court has determined that the 18505 Contract and Task Order 1 do not reflect "whether the parties in fact intended to contract" regarding the "bid floors." Accordingly, the Government's Cross–Motion for Summary Judgment regarding breach of the 18505 Contract and Task Order 1 is denied.

**3. The Government Will Be Granted Leave To Further Amend The August 18, 1999 First Amended Counterclaim To State A Claim In Quasi–Contract For Restitution.**

Although the court has denied the Government's breach of contract counterclaims, as a matter of law and in the interest of justice, it should be afforded the opportunity to pursue them in *quasi-contract* for restitution.

The RESTATEMENT OF RESTITUTION provides that a "person who has been unjustly enriched at the expense of another is required to make restitution to the other." RESTATEMENT OF RESTITUTION § 1 (1937).[8]

---

8. The court has found the March 31, 2000 Discussion Draft comments of the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT, presented at the American Law Institute Seventy-Seventh Annual Meeting on May 15–18, 2000, to be helpful in reaching its decision and worth the attention of the parties, particularly since Professor Farnsworth is one of the advisers.

 *a. Liability in restitution.* The source of a liability in restitution is the receipt of an economic benefit under circumstances such that its retention without payment would result in the unjust enrichment of the defendant at the

expense of the plaintiff. The consequence of a liability in restitution is that the defendant must either restore the benefit in question ... or else pay money in the amount necessary to eliminate unjust enrichment.

 *b. Unjust and unjustified enrichment.* The law of restitution is the law of unjust enrichment, but "unjust enrichment" is a term of art. The substantive part of the law of restitution is concerned with identifying those forms of enrichment that the law treats as "unjust" for purposes of imposing liability. . . .

As Professor Farnsworth explains, the claim for "quasi-contract" is derived from the common law action, *quantum meruit,* which "gradually became a flexible basis for recovery where a benefit had been received by the defendant and it would be inequitable for the defendant to retain it. This procedural term has persisted and is sometimes used inexactly as a synonym for the more general term *quasi-contract,* which refers to any money claim for the redress of unjust enrichment. Restitution is a still broader term, propagated by American Scholars in the twentieth century to embrace all remedies having that function, [including] ... claims to money ('quasi-contractual' claims)[.]" FARNSWORTH § 2.20 at 186. *See also USA Petroleum Corp. v. United States,* 821 F.2d 622, 625 (Fed.Cir.1987) (recognizing that the Government may assert a right to recover an overpayment under the equitable doctrine of restitution).

In *United States v. Applied Pharmacy Consultants, Inc.,* 182 F.3d 603 (8th Cir. 1999), former Chief Judge Arnold provided a succinct and insightful explanation about the difference between an action arising in contract from one in restitution:

> [A] party who can claim the benefit of an express agreement has no need of an unjust-enrichment theory. At common law, if you had a contract and believed it had been broken, you simply sued for breach of contract, or, to use the old terminology, you brought an action of special assumpsit. But if there was no express contract, but

> rather simply a claim for money had and received, or goods sold and delivered, under which you were attempting to recover the fair market value of goods or services conferred on the defendant, you would bring an action of general assumpsit, also known as indebitatus assumpsit. This last phrase means simply, "being indebted [to the plaintiff, the defendant] has agreed" to pay the debt. Both the debt and the agreement were fictional, in the sense that there was never a debt, properly so called, nor an express promise to pay it, but simply circumstances from which the law implied a financial obligation. If I have money that in justice belongs to you, you should recover it, notwithstanding the absence of an express promise on my part to pay you. So, if an express agreement exists between the parties, no need for a general action for money had and received could exist. The agreement itself would be the basis for the action, and complete justice would be done.

*Id.* at 606. In this case, complete justice requires the Government to be afforded an opportunity to pursue its counterclaims in quasi-contract for restitution.

Therefore, at the trial scheduled to commence on April 14, 2004, the Government first should be prepared to proffer sufficient evidence as to the elements of restitution. The Government should then proceed to put forth its case as to the measure of restitution to which it may be entitled in this case. *See*

---

The concern of restitution is not, in fact, with unjust enrichment in this broad sense, but with a narrower set of circumstances giving rise to what is more appropriately called *unjustified enrichment.* Compared to the open-ended implications of the term "unjust enrichment," instances of unjustified enrichment are both predictable and objectively determined, because the justification in question is not moral but legal. Unjustified enrichment is enrichment that lacks an adequate legal basis: it results from a transfer that the law treats as ineffective to work a conclusive alteration in ownership rights. Because the legal basis that makes a transfer effective is ordinarily a consensual exchange,... the concern of restitution is predictably with those anomalous transfers that cannot be justified by the terms of a valid and enforceable exchange transaction....

c. *Restitution and restoration.* Employed to denote liability based on unjust enrichment,

the word "restitution" is a term of art that has frequently proved confusing. The first Restatement of Restitution adopted the name "restitution" for this topic because recognition of unjust enrichment leads, in most instances, either to the avoidance of a transfer or to an obligation on the part of the transferee to pay for what has been transferred. Either remedy results in a form of "restitution" to the transferor. And yet the concepts of unjust enrichment and restitution (in the literal meaning of "restoration") correlate only imperfectly. On the other hand, there are significant instances of liability based on unjust enrichment that do not involve the restoration of anything the claimant previously possessed. Salient examples include cases involving the disgorgement of profits, or other benefits wrongfully obtained, in excess of the plaintiff's loss[.]

RESTATEMENT (THIRD) OF RESTITUTION § 1 at 1–3, 6 (March 31, 2000) (emphasis in original).

*Texas American Oil Corp. v. United States,* 44 F.3d 1557, 1570 (Fed.Cir.1995) (citing *Kelly v. Robinson,* 479 U.S. 36, 52, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)) ("[R]estitution ... may be calculated by reference to the amount of harm the offender has caused."). Then, the court will entertain Hamilton's evidence regarding whatever damages it alleges are due under the 18161 Contract and Task Order 7, as well as its case as to how the court should ascertain the proper amount of restitution in this case. As soon as possible, following the trial, the court intends to issue an opinion and order that enters a final judgment regarding Hamilton's breach of contract claim for damages and the Government's potential counterclaim in quasi-contract for restitution.

## CONCLUSION

Accordingly, in the interest of justice, the Government is hereby granted 10 days to further amend the August 18, 1999 First Amended Counterclaim to state a claim in quasi-contract for restitution. Since there is no just reason for delay, Hamilton's October 1, 2003 and November 3, 2003 Motions for Summary Judgment and the Government's November 3, 2003 Cross–Motion for Summary Judgment are denied.

The court will convene a telephone conference on March 25, 2004 to be arranged by the court at a time convenient to the parties.

**IT IS SO ORDERED.**